**LSREF2 BARON, LLC, Plaintiff,**

v.

**ALEXANDER SRP APARTMENTS, LLC, Defendant/Third–Party Plaintiff,**

v.

**Hudson Americas LLC, Third–Party Defendant.**

Civil Action No. 1:12–CV–2545–AT.

United States District Court, N.D. Georgia, Atlanta Division.

Signed Feb. 13, 2013.

13. The Court **DENIES AS MOOT** the Third–Party Defendants' first Motion to Dismiss [Doc. 41].

**1298**

Lisa Fivars Harper, Taylor, Feil, Harper, Lumsden & Hess, PC, Atlanta, GA, for Plaintiff.

Andrew Mabon Beal, Beal Law Group, Atlanta, GA, for Defendant/Third–Party Plaintiff.

Lisa Fivars Harper, Taylor, Feil, Harper, Lumsden & Hess, PC, Atlanta, GA, for Third–Party Defendant.

## ORDER

AMY TOTENBERG, District Judge.

This matter is before the Court on two motions:

(1) Plaintiff/Counter–Defendant LSREF2 Baron, LLC ("Baron") and Third–Party Defendant Hudson Americas LLC's ("Hudson") Motion to Dismiss [Doc. 14]; and

(2) Baron and Hudson's Motion to Strike Defendant/Third–Party Plaintiff Alexander SRP Apartments, LLC's ("Alexander") Jury Demand [Doc. 16].

For the reasons discussed below, the Court **GRANTS** the Motion to Dismiss [Doc. 14] and **DENIES** the Motion to Strike [Doc. 16].

## I. MOTION TO DISMISS

### A. Legal Standard

This Court may dismiss a pleading for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). A pleading fails to state a claim if it does not contain allegations that support recovery under any recognizable legal theory. 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1216 (3d ed.2002); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). In considering a Rule 12(b)(6) motion, the Court construes the pleading in the non-movant's favor and accepts the allegations of facts therein as true. *See Duke v. Cleland*, 5 F.3d 1399, 1402 (11th Cir.1993). The pleader need not have provided "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929

(2007). In essence, the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955).

## B. Factual Background

The Court derives the facts herein from allegations in Defendant/Third–Party Plaintiff Alexander SRP Apartments, LLC ("Alexander") Counterclaim and Third Party Complaint, consistent with the standard discussed above.[1]

Alexander borrowed over seventeen million dollars from Regions Bank ("RB") to finance the development of a multifamily apartment project in Brunswick, Georgia. (Counterclaim ¶ 7.) As part of this transaction, Alexander granted RB a security interest in certain real and personal property (memorialized in the "Security Deed") and executed a promissory note ("Note") for the loan amount. *(Id.)* [2]

In addition, as part of this financing arrangement, Alexander signed an "Assignment of Leases and Rents" ("Assignment") on February 26, 2008. (Compl. Ex. C ("Assignment").) [3] Pursuant to the Assignment, Alexander assigned to RB, among other things, "Rents" that it collects from tenants in its apartment complex.

Borrower hereby absolutely and unconditionally assigns and grants to Lender ... [a]ll rents, additional rents, revenues, income, issues and profits arising from the Leases and renewals and replacements thereof and [Alexander's] interest in any cash or security deposited in connection therewith and together with all rents, revenues, income, issues and profits ... whether paid or accruing before or after the filing by or against [Alexander] of any petition for relief under the Bankruptcy Code (collectively, the "Rents").

(Assignment § 1.1(c).)

RB then granted Alexander a "revocable license to collect and receive the Rents and other sums due under the Leases and Lease Guaranties." *(Id.* § 2.1.) Alexander was to "hold the Rents and all sums received pursuant to any Leases and Lease Guaranties, or a portion thereof sufficient to discharge all current sums due on the Debt and to pay operating expenses of the Property, in trust for the benefit of [RB] for use in the payment of such sums." *(Id.* § 2.1.) Finally, if Alexander defaulted on the Loan, the Assignment provided for an automatic revocation of this license. *(Id.* § 3. 1.)

Alexander· made all its monthly payments owed under the Note. (Counterclaim ¶ 8.) The Loan became due on January 26, 2011. *(Id.)* Alexander and RB negotiated a forbearance agreement granting Alexander a one-year extension of the loan. *(Id.* ¶ 9.) Thus, Alexander had until January 26,

---

1. Alexander filed its Answer, Counterclaim and Third–Party Complaint as one document. (Doc. 7.) The paragraphs of Alexander's Answer are numbered 1 through 49. Alexander then begins renumbering the paragraphs in his Counterclaim and Third–Party Complaint (continuously). Alexander's Third–Party Complaint begins at paragraph 60. Alexander incorporates into its Counterclaim and Third–Party Complaint its responses to paragraphs 1 through 49 of Plaintiff's Complaint as set forth in its Answer. (*See* Counterclaim ¶ 1 and Third–Party Complaint ¶ 60.) Thus, the Court will refer to the Counterclaim, Third–Party Complaint or Answer as necessary and appropriate.

2. The Note is Exhibit A (Doc. 7–1) to the Counterclaim and the Security Deed is Exhibit B (Doc. 7–2).

3. The parties agree that Exhibit C to the Complaint is a true and correct copy of the Assignment. (Answer ¶ 8.)

2012, to repay the loan. (Answer ¶ 12.) On or about July 1, 2011, RB sold the loan to LSREF Baron Trust 2011. (Counterclaim ¶ 10.) Then, through a series of transfers, Plaintiff LSREF2 Baron, LLC ("Baron") became the current holder of the Note and Security Deed. (*Id.* ¶ 11.) Finally, January 26, 2012, arrived and Alexander failed to satisfy the debt. (Answer ¶ 14.)

On March 5, 2012, Alexander filed for Chapter 11 bankruptcy relief triggering an automatic stay to certain legal proceedings. (Counterclaim ¶ 13.) Plaintiff filed a motion for relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1) and (2). (*See* Counterclaim Ex. C.) On April 20, 2012, the United States Bankruptcy Court for the Southern District of Georgia, Brunswick Division entered an order granting Baron's motion. (Counterclaim ¶ 14 and Ex. C.)

In a letter dated May 24, 2012, Baron, through its attorneys, sent notice to Alexander that Alexander had defaulted on the Note; that Baron demanded full payment; and that Baron intended to foreclose on Alexander's property on June 5, 2012. (*Id.* ¶ 12.) For four weeks before the scheduled foreclosure sale of the subject property, Baron published a notice of foreclosure (the "Notice") once per week in the Brunswick News. (*Id.* ¶ 14; Notice.) [4]

The Notice was published as one unitary advertisement for the sale of all Alexander's collateral, both real property and personal property. (Notice.) The Notice listed 14 types of property securing Alexander's loan.[5] One type of property, "Improvements," included, among other things, "fixtures." (Notice at 3.) Another category of property called "Fixtures and Personal Property" also listed fixtures. (*Id.* at 3.) This section contained a collection of property that would be sold at the foreclosure sale including "machinery, equipment, fixtures (including, but not limited to, all heating and air conditioning, plumbing, lighting, communications and elevator fixtures) and other property." (Notice at 3.) A separate section of the Notice defined the term "Funds." (Notice at 4.) According to the Notice, "Funds" include only those funds, cash or other sums that are "held by Lender in any escrow, reserve or other accounts established under the Note, the Security Instrument, or Other Security Document if any." (Notice at 5.) The Notice then states that all the property listed would be sold at the foreclosure sale "less and except Funds." (Notice at 4.) Nowhere does the Notice quantify the amount of cash held by or on behalf of Alexander.

Although the Notice did not separate real property from personal property, it provided that the lender could sell the property separately in this manner. (Notice at 5.) [6] Alexander admits that selling the property in these two lots is also consistent with the terms of the Security

---

**4.** The Notice is Exhibit D (Doc. 7-4) to the Counterclaim.

**5.** The 14 types of property included: (a) Land; (b) Additional Land; (c) Improvements; (d) Easements; (e) Fixtures and Personal Property; (f) Leases and Rents; (g) Insurance Proceeds; (h) Condemnation Awards; (i) Tax Certiorari; (j) Conversion; (k) Rights; (*l*) Agreements; (m) Intangibles; and (n) Other Rights. (Counterclaim ¶ 16; Notice at 1–3.)

**6.** Specifically, the Notice stated, that Baron could "sell that portion of the Property (less and except Funds), which, under the laws of the State of Georgia, constitutes an estate or interest in real estate separately from that portion of the Property (less and except Funds), which, under the laws of the State of Georgia, constitutes personalty and not an interest in realty." (Notice at 5.)

Deed. (*Id.* ¶ 17.) Specifically, the Security Deed states that the lender could sell the property "in one or more parcels or in several interests or portions and in any order or manner." (Security Deed § 11.1(b); *see also* Security Deed § 1.3(b)(i) ("In the event of a foreclosure sale, the Property may, at the option of Lender be sold as a whole. . . .")). Pursuant to these provisions of the Notice and Security Deed, Baron split Alexander's property into two lots, one of realty and the other of personalty, and sold them separately. (Counterclaim ¶¶ 36–37.)[7] The crux of Alexander's claim is based on Baron's sale of the personal property for a grossly inadequate price and the alleged confusion caused by the split of the property and the way the foreclosure sale was carried out.

According to Alexander, its personal property was valued at over $1.5 million and included the following:

(1) about $322,000 in its operating account (with approximately $19,000 of currently due operating expenses) (Counterclaim ¶ 29);

(2) about $35,000 in security deposits in its security deposit account (*Id.*);

(3) over $300,000 worth of tangible personal property (*Id.* ¶ 32); and

(4) construction defect claims against Alexander's builder, a subcontractor, and an architect valued at over $1,000,000 (*Id.* ¶ 35).[8]

As Baron had been involved in the previous bankruptcy proceedings, Baron was aware at the time of the foreclosure sale that Alexander had over $300,000 in cash. (*Id.* ¶ 30.) Nonetheless, Baron did not quantify the amount of cash held by or on behalf of Alexander in the Notice or at the foreclosure sale. (*Id.* ¶ 31.) Then, at the sale, Baron auctioned the personalty to itself for a bid of $25,000. (*Id.* ¶ 37.) Baron now contends that the personalty it bought included all Alexander's cash and tangible personal property and Alexander's construction defect claims—that is, personalty worth over $1.5 million.[9]

Finally, Alexander alleges that Third–Party Defendant Hudson Americas, LLC ("Hudson") was the entity that actually published the notice on behalf of Baron "as its agent." (Third Party Complaint ¶¶ 60, 66, 68–69, and 75–77.) In addition, according to Alexander, Hudson knew that the actual value of Alexander's personalty at the time of the foreclosure sale was more than $1.5 million. (*Id.* ¶ 77.)

Baron initiated this suit seeking a declaratory judgment that, as a result of Alexander's default on its loan, Baron was entitled to sole possession of the Rents. (Compl.) Baron's argument is twofold: (1) "Defendant's license to retain the Rents in

---

**7.** In its Response Brief, Alexander alleges that this decision to sell the property in two lots was made at the "last minute." (Alexander's Resp. Pl.'s Mot. Dismiss (Doc. 17) at 24.) However, because Alexander did not make this allegation in its Counterclaim, the Court does not consider it for purposes of Baron and Hudson's motion to dismiss. If Alexander views this fact as relevant, it should include specific allegations regarding this last minute change in its amended Counterclaim and Third–Party Complaint.

**8.** In addition, Alexander alleges that its own attorneys controlled about $76,000 in an escrow account, held on its behalf as attorney's fees for services. (Counterclaim ¶ 29.)

**9.** Alexander also alleges that it "notified Plaintiff that certain model home furnishing located at the property belonged to a neighboring single-family home development, not Defendant." (Counterclaim ¶ 42.) According to Alexander, Baron "refused to return these model home furnishings to the rightful owner and, instead, converted them for its own use." (Counterclaim ¶ 42.) Alexander does not assert a claim of conversion, however.

trust for [Baron] was immediately revoked upon the event of default" (*Id.* ¶ 41); and (2) "[Baron] had a properly perfected security interest in the Rents, and foreclosed on the Rents pursuant to the foreclosure sale" (*Id.* ¶ 42).

In response, Alexander filed this Counterclaim and Third–Party Complaint alleging wrongful foreclosure. Alexander contends that a confusing foreclosure notice coupled with Baron and Hudson's conduct at the foreclosure sale, and in particular Baron's extremely low bid, "chilled the sale resulting in an absurdly low and grossly inadequate sales price for the personalty." (Alexander's Resp. Pl.'s Mot. Dismiss (Doc. 17) at 3; *see also* Counterclaim ¶¶ 43–54.) Based on this theory, Alexander seeks to set aside the foreclosure sale of its personalty, or, in the alternative, damages. (Counterclaim at 33.)

## C. Analysis

■ To state a claim for wrongful foreclosure, Alexander must allege a breach of a duty owed to it and that such breach was the proximate cause of its injuries. *Racette v. Bank of Am., N.A.,* 318 Ga.App. 171, 733 S.E.2d 457, 462 (2012) ("In Georgia, a plaintiff asserting a claim of wrongful foreclosure must establish a legal duty owed to it by the foreclosing party, a breach of that duty, a causal connection between the breach of that duty and the injury it sustained, and damages.") (quoting *Gregorakos v. Wells Fargo Nat. Assn.,* 285 Ga.App. 744, 647 S.E.2d 289, 292 (2007)); *Heritage Creek Dev. Corp. v. Colonial Bank,* 268 Ga.App. 369, 601 S.E.2d 842, 844 (2004). In this case, Alexander alleges a breach of the duty to "exercise the power of sale fairly and in good faith" imposed upon foreclosing entities pursuant to O.C.G.A. § 23–2–114. *Racette,* 733 S.E.2d at 462 (citing O.C.G.A. § 23–2–114). In particular, Alexander alleges that Baron

and Hudson's conduct "chilled the bidding" at the sale, resulting in a grossly inadequate sales price.

■ A claim of "chilling the bidding" arises from allegations that the foreclosing party's conduct (perhaps in combination with the conduct of others) suppressed the bidding at a foreclosure sale. *Little v. Fleet Fin.,* 224 Ga.App. 498, 481 S.E.2d 552, 557 (1997) ("What is forbidden is a prior agreement or understanding that is in any manner *outcome determinative, i.e.,* impacts on the amount of the highest bid or the identity of the successful bidder so as to chill either the bidding or the sale's price . . . .").

■ To hinge a wrongful foreclosure claim on alleged bid-chilling, the debtor must allege (1) a grossly inadequate price and (2) conduct that amounts to fraud, mistake, misapprehension, surprise or similar behavior. *Giordano v. Stubbs,* 228 Ga. 75, 184 S.E.2d 165, 168–69 (1971); *Brown v. Freedman,* 222 Ga.App. 213, 474 S.E.2d 73, 76 (1996); *Kennedy v. Gwinnett Commercial Bank,* 155 Ga.App. 327, 270 S.E.2d 867, 871–74 (1980). Inadequacy of price alone is insufficient to sustain a claim for wrongful foreclosure. *Giordano,* 184 S.E.2d at 168–69; *Kennedy,* 270 S.E.2d at 873–74; *Vieira v. CitiGroup, Inc.,* No. 1:12–CV–1636–TWT, 2013 WL 275581, at *5–6 (N.D.Ga. Jan. 23, 2013) (Thrash, J.).

■ Alexander has sufficiently alleged a grossly inadequate sales price. According to Alexander, for merely $25,000, Baron sold personalty to itself valued at over $1.5 million. Thus, to state a wrongful foreclosure claim, Alexander must also allege a plausible claim that Baron and Hudson's conduct amounted to "fraud, mistake, misapprehension, surprise, or other circumstances which might authorize a finding that such circumstances contributed to

bringing about the inadequacy of price." *Kennedy*, 270 S.E.2d at 872.

Alexander argues that Hudson and Baron's conduct chilled the bidding in two ways. First Alexander alleges that Hudson and Baron published a foreclosure notice that confused buyers about what would be sold at the foreclosure sale. This confusion, according to Alexander, discouraged buyers from showing up or competitively bidding at the foreclosure sale. Second, Alexander alleges that Baron and Hudson's conduct *at the foreclosure sale* chilled the bidding by signaling to other potential purchasers that the personal property had no significant value. (*See* Doc. 17 at 14.) The Court addresses each argument in turn, but first considers and rejects Baron and Hudson's assertion that Alexander's default on the loan precludes its wrongful foreclosure claim.

### 1. Alexander's Default on the Loan

██ Contrary to Baron and Hudson's assertion, Alexander may bring a claim for wrongful foreclosure claim based on allegations of chilling the sale despite Alexander's failure to make the proper loan payments. *See, e.g.*, *Racette*, 733 S.E.2d 457; *Brown*, 474 S.E.2d at 76 ("A claim for wrongful exercise of a power of sale can be asserted even though a debt is in default."). Indeed, such claims implicitly recognize that the debtor has defaulted and instead focus on the lender's conduct at the sale, which allegedly reaped an unfairly low price for the collateral. *See generally* Justin Lischak Earley, *Chilling the Bidding*, 5 John Marshall L.J. 99 (2011).

Baron and Hudson argue that *Brown* is an "aberrant decision that conflicts with prior Georgia case law." (Reply at 12–13 (citing *Aetna Fin. Co. v. Culpepper*, 171 Ga.App. 315, 320 S.E.2d 228, 231–32 (1984)).) First, *Brown* is not aberrant. For example, in 2012, the Georgia Court of Appeals again allowed a claim for wrongful foreclosure to proceed based on chilling the bidding even though the debtor was in default. *Racette*, 733 S.E.2d 457. Second, *Brown* does not conflict with prior Georgia case law. To show a conflict in Georgia law, Baron and Hudson quote from *Culpepper*:

> [W]hen the debt [is] secured by a security deed and note giving the creditor the right and power to advertise and sell the security for the payment of the balance due on the debt upon default of the debtor, the creditor commits no libel or tortious act by exercising the right granted in contract.

*Culpepper*, 320 S.E.2d at 231–32 (quoting *Rome Bank & Trust v. Kerce*, 140 Ga.App. 596, 231 S.E.2d 464 (1976)). The principle that the court in *Culpepper* articulates here, however, is not broadly applicable to every wrongful foreclosure claim. Rather, courts have held that where the damages in a wrongful foreclosure claim are "solely attributable" to the debtor's own actions in defaulting, then no wrongful foreclosure claim can lie. *See, e.g.*, *Heritage Creek*, 601 S.E.2d at 844, 845 (holding that plaintiff failed to allege causation when its "alleged injury was solely attributable to its own acts or omissions both before and after the foreclosure") (emphasis added); *Howard v. Mortgage Electronic Registration Sys., Inc.*, No. 1:10–cv–1630–WSD, 2012 WL 3582586, at *5–6 (N.D.Ga. Aug. 17, 2012) (Duffey, J.)[10]. Indeed, if the

---

**10.** In *Howard,* the plaintiff alleged that the defendant lender had no standing to foreclose because it was not the holder of the Note. *Id.* at *5. The court rejected plaintiff's claim finding that the defendant had standing as an agent of the holder of the debt. *Id.* In dicta, the court also recognized that any injury Plaintiff incurred was "solely attributable to his own actions" in defaulting on the loan. *Id.* at *6. Thus, Plaintiff failed to show causa-

debtor's default was the sole cause of his injury, then the lender's conduct was not the proximate cause, and the debtor fails on a crucial element of his wrongful foreclosure claim. *Howard,* 2012 WL 3582586, at *5–6. In fact, in *Culpepper,* the debtor went into bankruptcy, which prevented the foreclosure sale. The court rejected the plaintiff's wrongful foreclosure claim, noting that because no foreclosure sale had occurred, she had "suffered no legal injury and proved no damages." *Culpepper,* 320 S.E.2d at 232.

Alexander's alleged damages, in contrast, are not *solely attributable* to its default. Alexander alleges that Baron and Hudson conducted the foreclosure sale unfairly, leading to a grossly inadequate sales price. (*See generally* Counterclaim and Third–Party Complaint.) Unlike in *Howard* or *Heritage Creek,* the alleged damages here "include a loss in the amount of the difference between the fair market value of the personalty and the sales price." (Counterclaim ¶ 55.) Alexander's default on the loan, though of course causally related to this alleged injury, is not the sole cause. The Court therefore rejects Baron and Hudson's argument and finds that Alexander's default on the loan has no bearing on its wrongful foreclosure claim.

### 2. The Foreclosure Notice

■ The Court now turns to the merits of Alexander's claims, beginning with its allegations that the Notice was confusing and inadequate. As an initial matter, a bid-chilling claim premised on inadequacies in the foreclosure notice can succeed even when the foreclosure notice complies with the requirements of O.C.G.A. § 9–13–140(a).[11] *See, e.g., Racette,* 733 S.E.2d at 463 ("[W]hile an advertisement that fails to mention an existing senior lien on the property, or that references a senior lien that in fact has been cancelled, may not be defective as a matter of law, it is for the fact finder to determine whether the advertisement ultimately chilled the bid."). Thus, Alexander's admission that the Notice here complied with these minimum statutory requirements does not preclude its claim for wrongful foreclosure.

■ However, to support a bid-chilling claim based on inadequacies in a foreclosure notice, Alexander's allegations must support a plausible inference that the Notice as published confused or misled potential buyers. *Amirfazli v. VATACS Group, Inc.,* 311 Ga.App. 471, 716 S.E.2d 523, 525 (2011); *Tarleton v. Griffin Fed. Sav. Bank,* 202 Ga.App. 454, 415 S.E.2d 4, 6 (1992). "Errors that would not confuse the bidding intentions of any potential bidder of sufficient mental capacity to enter a binding contract for the sale of the real property do not show a chilling of the sale so that a fair market value bid was not obtained." *Amirfazli,* 716 S.E.2d at 525 (quoting *Williams v. S. Cent. Farm Credit,* 215 Ga.App. 740, 452 S.E.2d 148 (1994)); *Tarleton,* 415 S.E.2d at 6 (holding that a notice that directs potential bidders to the wrong page of the deed book and errone-

---

tion, an essential element in a wrongful foreclosure claim. *Id*

**11.** On the other hand, "[t]he minimum legal requirements of a foreclosure advertisement are prescribed in O.C.G.A. § 9–13–140(a), and only a failure to properly include those items will render the advertisement defective as a matter of law." *Se. Timberlands, Inc., et al. v. Sec. Nat'l Bank,* 220 Ga.App. 359, 469 S.E.2d 454, 456 (1996). Pursuant to O.C.G.A. § 9–13–140(a), a foreclosure advertisement must "give a full and complete description of the property to be sold, making known the names of the plaintiff, the defendant, and any person who may be in possession of the property." The notice must also include the legal description of real property, if such is to be sold at the sale. O.C.G.A. § 9–13–140(a).

ously repeats a minor mistake in describing the property would not have confused the bidding intentions of potential bidders and thus could not support a claim for wrongful foreclosure); *cf., Racette*, 733 S.E.2d at 463 (holding that a notice that erroneously references a senior lien that had been cancelled plausibly could have chilled the bidding when the final price was grossly inadequate).

█ According to Alexander, the Notice chilled the bidding by failing to clearly identify the personal property to be sold at the sale and "blurr[ing] the line between" what would be sold as personalty as opposed to realty. (Doc. 17 at 12–13.) [12] Alexander puts forth several arguments to support this characterization of the Notice.

First, according to Alexander, the published foreclosure notice "omitted significant information about the personalty being sold and included superfluous, misleading, and confusing terms." (Counterclaim ¶ 45.) In particular, Alexander alleges that the Notice "fail[ed] to quantify the amount of cash held by or on behalf of Defendant." (*Id.* ¶ 51.) The Court uncovered no Georgia law or case precedent requiring a foreclosure notice to quantify the amount of cash held by the debtor, or otherwise indicate the value of the property sold. Moreover, the failure to quantify in a published foreclosure notice the amount of cash held by the debtor is not the type of conduct that gives rise to a claim of the breach of duty to exercise the power of sale

fairly. Indeed, this omission of information that the lender has no duty to include is far from fraud, mistake, misapprehension, or surprise. *Cf. Racette*, 733 S.E.2d at 461 (recognizing a viable wrongful foreclosure claim premised on a foreclosure notice that *mistakenly* stated that the property would be sold subject to a senior lien).

Next, the Notice excluded "Funds" from the foreclosure sale, and Alexander alleges this gave the impression that no cash (such as rents) would be sold. This allegation is simply not plausible. The Notice narrowly defines what would be excluded from the sale as Funds. According to the Notice, "Funds" include only those funds, cash or other sums that are "held by Lender in any escrow, reserve or other accounts established under the Note, the Security Instrument, or Other Security Document if any." (Notice at 5.) On the other hand, "Rents" include the "revenues, issues and profits" associated with the debtor's leases. While Funds include only the money held by Lender in escrow or similar accounts, Rents include money collected by debtor as rents for its leases. Thus, any bidder of sufficient mental capacity reading the published foreclosure notice would understand that cash, such as that collected as "Rent" is not the same as "Funds." Thus, it is not plausible that bidders of sufficient mental capacity reading the Notice would be confused to believe that no cash would be sold at the foreclosure sale.

12. In its Counterclaim and Third Party Complaint, Alexander asserted that Hudson and Baron "breached [their] duty to Alexander by dividing Alexander's property into two lots consisting of one lot of realty and a second lot of personalty." (Third Party Complaint ¶ 73; Counterclaim ¶ 49.) However, Alexander admits in its response brief that merely selling the property in these two lots did not violate Baron and Hudson's duty to exercise the power of sale fairly. (Doc. 17 at 12–13.) Selling the property in two lots in this manner is consistent with the terms of the Security Deed and the call of the Notice alerting potential buyers that the property might be sold in these two lots. (Security Deed § 11.1(b); Notice at 5; *see also* Security Deed § 1.3(b)(i) ("In the event of a foreclosure sale, the Property may, at the option of Lender be sold as a whole. . . .").)

Finally, Alexander alleges that the use of the term "fixtures" in the Notice could have confused potential bidders as to what would be sold as realty. According to Alexander, a potential buyer might read the Notice and draw the conclusion that "almost everything in the apartment complex would be wrapped up with the fixtures." (Doc. 17 at 11.) The Court disagrees. In a section entitled "Fixtures and Personal Property," the Notice lists a collection of property that would be sold at the foreclosure sale including "machinery, equipment, fixtures (including, but not limited to, all heating and air conditioning, plumbing, lighting, communications and elevator fixtures) and other property." (Notice at 3.) By including the parenthetical after the term "fixtures," the Notice provides a list of the type of property considered a "fixture." It is simply not plausible that a bidder of sufficient mental capacity reading the Notice would conclude that "almost everything in the apartment" would fall in the same category as "heating and air conditioning, plumbing, lighting, communications and elevator fixtures." This is particularly true, when in the same breath, the Notice identifies items that are *not* examples of fixtures, like "machinery and equipment."

In any case, the Notice clearly states that what would be sold as realty includes anything defined as realty under Georgia law. (Notice at 5 (stating that if the lender decides to sell the realty and personalty separately, the sale of realty would include property that "under the laws of the State of Georgia, constitutes an estate or interest in real estate" and the personalty would include that "which, under the laws of the State of Georgia constitutes personalty and not an interest in real estate").) Under Georgia law, a fixture is "[a]nything which is intended to remain permanently in its place even if it is not actually attached to the land ... [and] constitutes a part of the realty." O.C.G.A. § 44–1–6. Thus, a bidder would understand that fixtures, such as those listed in the Notice, would be sold as realty. *See Nat'l Community Builders, Inc. v. Citizens & S. Nat. Bank*, 232 Ga. 594, 207 S.E.2d 510, 512–13 (1974) ("The term 'real estate' as used in [Georgia's] foreclosure and confirmation statutes is a fixed legal concept, and when realty is described by metes and bounds and sold, then the sale includes all improvements that are 'part of the realty.'"). Accordingly, the Court finds that the foreclosure notice as published was not confusing and thus its publication cannot be the basis for Alexander's wrongful foreclosure claim.

### 3. Conduct at the Foreclosure Sale

Alexander's next argument is that Baron and Hudson's conduct at the foreclosure sale, and in particular the reading of the foreclosure Notice and Baron's low starting bid, was meant to and in fact did suppress other, higher bids. These allegations are facially deficient in two respects. First, many of Alexander's allegations are contained only in its response brief, and thus not considered on this motion to dismiss. *See St. George v. Pinellas County*, 285 F.3d 1334, 1337 (11th Cir.2002) ("The scope of the review must be limited to the four corners of the complaint.").

More substantively, however, Alexander fails to allege a causal connection between Baron and Hudson's alleged conduct and the grossly inadequate sales price. *See, e.g., Heritage Creek Dev. Corp. v. Colonial Bank*, 268 Ga.App. 369, 601 S.E.2d 842, 844–45 (2004) (affirming grant of summary judgment where a bid-chilling claim failed to show a causal connection between Defendant's conduct and the alleged injury). As Baron and Hudson point out, "Alexander has not alleged that other parties were present and ready to bid or that such

parties relied on [Baron's] bid." (Reply Br. Opp. Mot. Dismiss (Doc. 21) at 12.) Absent allegations to support a causal connection between Baron's conduct and the grossly inadequate sales price, Alexander has failed to allege a plausible claim of wrongful foreclosure. For the foregoing reasons, the Court **DISMISSES** Plaintiff's claim for wrongful foreclosure.

### D. Leave to Amend

▆▆ As more thoroughly discussed below, because Alexander may be able to state a wrongful foreclosure claim with additional facts, some of which it has asserted in its response brief, the Court will grant Alexander's request for leave to file an amended complaint. (*See* Alexander's Resp. Pl.'s Mot. Dismiss (Doc. 17) at 3.)

▆▆ In evaluating bid-chilling claims such as Alexander's, the Court should consider all the circumstances. *Brown v. Freedman*, 222 Ga.App. 213, 474 S.E.2d 73, 76 (1996) ("It is the 'circumstances' in conjunction with the price, that can lead to a recovery."). One such circumstance might be a low opening bid by the lender with knowledge of the value of the property. *See* Justin Lischak Earley, *Chilling the Bidding*, 5 JOHN MARSHALL L.J. 99, 108–122–23 (2011). In such a case, the lender's low bid could be intended as a signal to others that the property is worth less than it is.

The foreclosure auction is in some sense a public negotiation over one and only one zero-sum variable: price. In any zero-sum negotiation, the opening position often determines the scope of the outcome. That is to say, if the opening bid is high then the outcome is likely to be a high price, and if the opening bid is low then the outcome is likely to be a low price. By starting its opening bid too low, the lender may (with hindsight) be accused of planting the seeds of a foreclosure sale price that was too low to be acceptable.

*Id.* at 122–23 (internal citations omitted).[13]

According to Alexander, when read aloud, the foreclosure notice confused potential bidders. (*See, e.g.,* Counterclaim ¶ 28.) In particular, Alexander alleges that "the exclusion of the Funds gave the impression that no cash, such as rents, would be included in the sale." (*Id.*) Alexander also appears to argue that the Notice, as read at the sale, failed to delineate clearly what would be sold as realty as opposed to personalty. And in its response brief, Alexander adds that the Baron and Hudson's "last minute" decision to split the property into two lots (realty and personalty), contributed to this confusion. (*See* Doc. 17 at 2.)

In addition, Baron and Hudson allegedly knew that Alexander's contract claims for construction defects were worth over $1,000,000 (Doc. 17 at 6 (citing Counter-

---

**13.** In this action, Baron is not seeking to obtain a deficiency judgment. Indeed, "[t]he lender's right to obtain a deficiency judgment is not directly at stake in a motion to set aside a foreclosure sale." *Cartersville Developers, LLC v. Georgia Bank & Trust*, 292 Ga.App. 375, 664 S.E.2d 783, 786 (2008). Thus, this Court is in no position to address whether Baron's low bid led to a commercially unreasonable sale such that it would not be entitled to a deficiency judgment. *See, e.g., Farmers Bank, Union Point v. Hubbard*, 247 Ga. 431, 276 S.E.2d 622, 627 (1981) (holding that where the sole defect is the adequacy of the sale price, the creditor must overcome the presumption that the value of the collateral equals the debt on it in order to obtain a deficiency judgment); *Richard v. Fulton Nat. Bank*, 158 Ga.App. 595, 281 S.E.2d 338, 340 (1981) ("Where the commercial reasonableness of a sale is challenged by the debtor, the party holding the security interest has the burden of proving that the terms of the sale were commercially reasonable and that the resale price was the fair and reasonable value of the collateral.").

claim Ex. C at 9)), and that the total value of Alexander's personal assets was over $1.5 million (Counterclaim ¶ 53). According to Alexander, Baron and Hudson failed to quantify the amount of cash sold at the sale, and presumably failed to announce the value of the construction defect claims or other personal property. (*See* Counterclaim ¶ 51.)

Finally, Alexander alleges in its response brief, but only implicitly in its pleadings, that Baron's opening bid of $25,000 contributed to the chilling effect. (Doc. 17 at 3, 16–18; Counterclaim ¶¶ 37, 41, 53–54.)

These allegations, in totality, might suggest that Baron and Hudson's conduct was similar to the "fraud, mistake, misapprehension, [or] surprise" that can form the basis of a wrongful foreclosure claim. *See Brown*, 474 S.E.2d at 76. The Court recognizes that, while the Notice was not confusing as published (*see supra* Part I.C.2.), it may plausibly have been confusing when read aloud, particularly in light of a sudden decision to sell the personal property separately.[14] Alexander has cited no Georgia law requiring that the foreclosing party disclose at a foreclosure sale the value of personal property or the existence of valuable legal claims, and the Court has found none. Nonetheless, in conjunction with the confusingly-read foreclosure notice, the low initiating bid, and last minute decision to sell the real and personal property separately, a failure to identify personal property of substantial value whose existence is likely unknown to potential bidders, but known to the bank conducting the foreclosure, would be a circumstance relevant to establishing a wrongful foreclosure claim. Such conduct, in totality, might be considered similar to "fraud, mistake, misapprehension [or] surprise." *Brown*, 474 S.E.2d at 76. Thus, the Court **GRANTS** Alexander leave to amend its Counterclaim and Third–Party Claim.[15]

### E. Conclusion

For the foregoing reasons, the Court **GRANTS** Plaintiff/Counter–Defendant LSREF2 Baron, LLC and Third–Party Defendant Hudson Americas LLC's Motion to Dismiss [Doc. 14] and **GRANTS** Defendant/Third–Party Plaintiff Alexander leave to file an amended complaint within fifteen (15) days of the entry date of this Order.

## II. MOTION TO STRIKE

Plaintiff LSREF2 Baron, LLC ("Baron") and Third–Party Defendant Hudson Americas LLC ("Hudson") also move to strike the demand for jury trial stated in the Answer, Counterclaim and Third–Party Complaint [Doc. 16]. Baron and Hudson argue that, pursuant to the express terms of the promissory note ("Note"), deed to secure debt ("Security Deed") and Assignment of Leases and Rents ("Assignment"),[16] Defendant/Third–Party Plaintiff Alexander SRP Apartments, LLC ("Alexander") waived its right to a jury trial. Alexander does not deny that the Note, Security Deed and Assignment contain

---

**14.** However, Alexander does not allege the manner in which the Notice was read (for example, whether the Notice was read in parts or all at once).

**15.** The Court cannot determine from Alexander's pleadings and briefs the extent of Hudson's alleged involvement in the foreclosure sale. Should Alexander choose to amend its Third–Party Complaint, it must expressly identify the facts that would give rise to claims against Hudson for actions conducted the day of the foreclosure sale.

**16.** The Note is Exhibit A (Doc. 7–1) and the Security Deed is Exhibit B (Doc. 7–2) to the Counterclaim and Third–Party Complaint. The Assignment is Exhibit C to the Complaint.

such waiver clauses. Instead, Alexander argues that these clauses are invalid under Georgia law and thus unenforceable. For the reasons set forth below, the Court **DENIES** this motion.

The waiver provisions in the Note, Security Deed, and Assignment are all similar and read as follows: "BORROWER HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION...." (Note art. 11 (emphasis added); Security Deed § 14.6; Assignment § 5.9.)[17] Both the Note and Security Deed state that they "shall be governed, construed, applied and enforced in accordance with the laws of the State of Georgia." (Note art. 13; Security Deed § 17.1.) The Assignment incorporates all the terms from the Security Deed. (Assignment § 2.3.) Thus, according to the contracts, the waiver clauses are only enforceable to the extent permitted under Georgia law.

 Under Georgia law, pre-litigation jury trial waivers are entirely unenforceable. *Bank South, N.A. v. Howard,* 264 Ga. 339, 444 S.E.2d 799 (1994). Baron and Hudson do not question this. Instead, they argue that because this case is in federal court, *federal* law governs the enforceability of pre-litigation jury trial waivers, and under federal law, the waiver here *is* enforceable.

 To support their argument, Baron and Hudson refer to several cases standing for the general proposition that "[t]he right to a jury trial in the federal courts is to be determined as a matter of federal law in diversity as well as other actions." *Simler v. Conner,* 372 U.S. 221, 221, 83 S.Ct. 609, 9 L.Ed.2d 691 (1963); *see also Med. Air Tech. Corp. v. Marwan Inv., Inc., et al.,* 303 F.3d 11, 18 (1st Cir.2002) ("In a diversity jurisdiction suit, the enforcement of a jury waiver is a question of federal, not state, law."); *Tracinda Corp. v. DaimlerChrysler AG, et al.,* 502 F.3d 212, 222 (3d Cir.2007) (citing *K.M.C., Inc. v. Irving Trust Co.,* 757 F.2d 752 (6th Cir.1985)). Accordingly, the Eleventh Circuit has held that a pre-litigation jury trial waiver is enforceable so long as the waiving party "knowingly and voluntarily waived his right to a jury trial." *Bakrac, Inc., et al. v. Villager Franchise Sys., Inc.,* 164 Fed.Appx. 820 (11th Cir.2006) (assessing the validity of pre-litigation jury trial waiver in a contract governed by Florida law).[18] Baron and Hudson argue that the waiver "was conspicuously set forth" in the loan documents and Alexander, a sophisticated party, had the opportunity to negotiate the terms. (Doc. 16–1 at 7–9.) Thus, Baron and Hudson argue that the waiver is enforceable and compels this Court to strike Alexander's demand for jury trial.

The Court rejects Baron and Hudson's arguments for the reason Judge Clay D. Land recently articulated in a similar case in the Middle District of Georgia. *GE Commercial Fin. Bus. Property Corp., et al. v. Heard, et al.,* 621 F.Supp.2d 1305 (M.D.Ga.2009). Judge Land keenly recognized an important distinction between the type of cases Baron and Hudson rely upon, and cases like the one currently before this

---

**17.** The Assignment, which is Exhibit C to the Complaint, appears to be missing page 8. The parties agree, however, that this provision is in the Assignment. (Memo. Supp. Mot. Strike (Doc. 16–1) at 5; Resp. Mot. Strike (Doc. 18) at 5.)

**18.** In *Bakrac,* the court does not discuss Florida law regarding the validity of pre-litigation jury trial waivers, but as a general matter, such waivers are enforceable in Florida. *Vista Centre Venture v. Unlike Anything, Inc.,* 603 So.2d 576, 578 (Fla.Dist.Ct.App.1992) ("Waivers of the right to jury trial by contract are enforceable and will be upheld.").

Court. Speaking of the former, Judge Land states,

> [T]hose courts correctly held that in determining whether a state could *restrict* one's right to a jury trial, the state law at a minimum had to protect one's federal right to a jury trial under the U.S. Constitution. Thus, any contractual waiver of a jury trial under state law must assure that the waiver complies with the federal constitutional standard of being knowing and voluntary.

*Id.* at 1309.

 Where the right to a jury trial is threatened, Judge Land explained, federal law applies. "This does not mean, however, that the 'general federal law' (whatever that may be) mandates that all contractual waivers entered into knowingly and voluntarily shall always be enforced in actions filed in federal court." *Id.* at 1309. Judge Land reasons as follows:

> To accept this proposition, one would have to find in the U.S. Constitution a federally protected interest in the enforcement of a party's contractual *forfeiture* of the right to a jury trial. While there is certainly an important federal interest in protecting the right to a jury trial, this Court cannot find anywhere a federal interest in protecting the right *from* a jury trial.... [S]tates "are free to extend more sweeping constitutional guarantees to their citizens than does federal law, as federal constitutional law constitutes the floor, not the ceiling, of constitutional protection."

*Id.* at 1309 (quoting *Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1269 (3d Cir.1992)). Judge Land recognized that the federal constitutional requirements set a floor, not a ceiling, establishing minimum protections of a party's right to a jury trial.

Accordingly, in this case the Court should apply Georgia's law providing *more* protection of the right to a jury trial. Moreover, such application is consistent with the terms of the contracts. Here, the pre-litigation jury trial waiver is only valid to the "extent permitted by applicable law." (*See, e.g.,* Security Deed § 14.6.) And the applicable law here (Georgia's) does not permit pre-litigation jury trial waivers whatsoever. "Since the state law that presumptively applies does not diminish a federal right that either party possesses, it must be applied under *Erie [R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) ]." *GE Commercial*, 621 F.Supp.2d at 1309; *accord Odom v. Fred's Stores of Tenn., Inc.*, No. 7:12–cv–91 (HL), 2013 WL 83023 (M.D.Ga. Jan. 7, 2013) (adopting the reasoning of *GE Commercial*). Thus, the pre-litigation jury trial waiver is unenforceable in this action. Accordingly, the Court **DENIES** Hudson and Baron's Motion to Strike [Doc. 16].

## III. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiff/Counter–Defendant LSREF2 Baron, LLC ("Baron") and Third–Party Defendant Hudson Americas LLC's ("Hudson") Motion to Dismiss [Doc. 14]. However, the Court also **GRANTS** Defendant Alexander SRP Apartments, LLC leave to file an amended Counterclaim and Third–Party Complaint within fifteen (15) days of the entry date of this Order.

The Court **DENIES** Baron and Hudson's Motion to Strike [Doc. 16].