LSREF2 BARON, LLC, Plaintiff,

v.

ALEXANDER SRP APARTMENTS, LLC, Defendant/Third–Party Plaintiff,

Hudson Americas LLC, Third–Party Defendant.

Civil Action No. 1:12–CV–2545–AT.

United States District Court,
N.D. Georgia,
Atlanta Division.

Signed March 31, 2014.

Lisa Fivars Harper, Taylor, Feil, Harper, Lumsden & Hess, PC, Atlanta, GA, for Plaintiff.

Andrew Mabon Beal, Beal Law Group, Nicholas Prince Smith, Nicholas P. Smith,

Attorney at Law, Atlanta, GA, for Defendant/Third–Party Plaintiff.

## *ORDER*

AMY TOTENBERG, District Judge.

This case arises out of Defendant Alexander SRP Apartments, LLC's ("Alexander") default on a nearly $17 million loan from Regions Bank ("Regions") to fund the development of the Odyssey Lake Apartments in Brunswick, Georgia ("Apartment Complex" or "Property"). Plaintiff LSREF2 Baron, LLC ("LSREF"), Regions's putative successor in interest, foreclosed on the property with the assistance of Hudson Americas LLC ("Hudson") and purchased the real and personal property at the foreclosure sale. LSREF then brought this action arguing that, by virtue of Alexander's default, it is also entitled to about $370,000 worth of rents collected after default and before foreclosure. Alexander disagreed and countered with a wrongful foreclosure claim against LSREF and Hudson Americas LLC ("Hudson"), alleging that LSREF and Hudson's conduct at the foreclosure sale chilled the bidding, resulting in a grossly inadequate sales price of $25,000 for personal property worth substantially more than that.

LSREF and Hudson have moved for summary judgment. [Doc. 54].[1] For the reasons that follow, the Court finds that a genuine issue of fact exists as to whether LSREF is entitled to the disputed rents and thus **DENIES** LSREF and Hudson's motion to the extent it seeks summary judgment on its claim for declaratory relief. In addition, a reasonable jury could conclude, based on the evidence in the record, that LSREF's conduct at the foreclosure sale chilled the bidding in violation of LSREF's duty to exercise the foreclosure sale fairly. However, the record contains insufficient evidence to attribute this wrongful foreclosure liability to Hudson. For these reasons, the Court **GRANTS IN PART** and **DENIES IN PART** LSREF and Hudson's Motion for Summary Judgment seeking to dismiss Alexander's wrongful foreclosure claim and **DISMISSES** this claim against Hudson, only.

## I. PROCEDURAL BACKGROUND

LSREF initiated this suit seeking a post-foreclosure declaratory judgment on July 23, 2012. (Compl., Doc. 1.) LSREF sole substantive claim was that it was entitled to the rents collected from the time Alexander went into default until the foreclosure sale (the "Rents"), totaling about $370,000. (*Id.* Count I.) LSREF asserted that, by virtue of being assigned the interest in an "Assignment of Leases and Rents" ("ALR"), the Rents automatically and unconditionally became its property at the moment of default. (*Id.* ¶ 41.) Alternatively, LSREF maintained that the Rents became part of the foreclosure estate and thus, it purchased the Rents when it bought the property at the foreclosure sale. (*Id.* ¶ 42.)

In response, Alexander filed an Answer, Counterclaim against LSREF and a Third–Party Claim against Hudson on August 24, 2012. (Answer and Countercl., Doc. 7.) Alexander challenged LSREF's assertion that the ALR entitled it to possession of the Rents and disputed LSREF's contention that it properly foreclosed on the Rents. (Answer ¶¶ 41–42.)

---

1. Alexander also filed a Motion for Leave to File Surreply brief [Doc. 63], but did not attach its proposed brief to the Motion. The Court considers Alexander's arguments made in its Motion for Leave to File Surreply Brief, but otherwise **DENIES** this Motion [Doc. 63]. Finally, the Court **DENIES AS MOOT** Defendant Alexander SRP Apartments, LLC's ("Alexander") Motion to Take Judicial Notice [Doc. 65].

It also lodged a wrongful foreclosure claim against LSREF and Hudson, arguing that the two violated their statutory duty to exercise the power of sale fairly by employing a confusing foreclosure notice and then splitting the estate in two lots, selling the personal property to LSREF for a grossly inadequate price. (Countercl. ¶¶ 43–55.)

LSREF and Hudson moved to dismiss the Counterclaim, (Doc. 14), and on February 12, 2013, the Court granted LSREF and Hudson's motion (Feb. 13, 2013 Ord., 15 F.Supp.3d 1295, at 1306, 1308, 2013 WL 8335728, Doc. 42). The Court held that the foreclosure notice as published was not confusing and thus its publication could not be the basis for Alexander's wrongful foreclosure sale. (Feb. 13, 2013 Ord., 15 F.Supp.3d at 1306.) The Court also dismissed Alexander's wrongful foreclosure claim because Alexander failed to allege a causal connection between LSREF and Hudson's conduct at the Foreclosure Sale and the purportedly chilled or depressed final price. (*Id.* at 1306–07.) In particular, the Court noted that Alexander had not alleged whether other parties were present and ready to bid on the personal property or that any party actually relied on LSREF's bid in deciding not to offer a higher one. (*See id.*)

Despite these deficiencies in the Counterclaim, the Court granted Alexander leave to amend based on additional facts asserted in Alexander's response brief that could support a wrongful foreclosure claim premised on bid-chilling. (*Id.* at 1306–09.) The Court highlighted several such allegations including LSREF and/or Hudson's last-minute decision to split the property into two lots and its failure to indicate the allegedly substantial value of the personal property before announcing a surprisingly low opening bid of $25,000 given the assets sold. (*Id.*) The Court noted, however, that

as currently pled, it was unclear what role Hudson played in the foreclosure. (*Id.* at 1308 n. 15.) Accordingly, the Court instructed Alexander to expressly identify the facts that would give rise to claims against Hudson for actions conducted the day of the sale. (*Id.*)

On February 28, 2013, Alexander filed its Amended Counterclaim and Third–Party Complaint ("Amended Counterclaim"). (Am. Counterclaim. & 3d Party Compl. ("Am. Countercl."), Doc. 43.) In Alexander's Amended Counterclaim, it primarily alleged that LSREF's and, to some extent, Hudson's wrongful conduct at the foreclosure sale chilled the bidding and thus resulted in a grossly inadequate sales price for the personal property. (*Id.*)

Alexander subsequently filed another motion for leave to amend the Counterclaim and Third–Party Complaint, this time seeking to add a wrongful foreclosure claim based on Alexander's allegation that LSREF was not properly assigned the authority to foreclose. (Mot. Am. Countercl., Doc. 51.) Alexander explained that the loan and associated documents had been assigned from the original lender, Regions, to LSREF2 Baron 2011 Trust (the "Trust"), but the subsequent assignments from the Trust to Wells Fargo Bank, N.A. ("Wells Fargo") and then from Wells Fargo to LSREF were invalid. According to Alexander, these last two assignments were executed by Hudson, purportedly on behalf of the lender, but in fact Hudson had no authority to bind the lender, rendering the assignments ineffective.

The Court denied Alexander's motion as futile, relying on *Montgomery v. Bank of America,* 321 Ga.App. 343, 740 S.E.2d 434, 438 (2013), *cert. denied,* No. S13C1177 (Ga. Sept. 9, 2013). (Oct. 1, 2013 Ord., 15 F.Supp.3d 1351, 1353–54, 2013 WL 8335731, Doc. 66.) In *Montgomery,* the

Georgia Court of Appeals held that a wrongful foreclosure plaintiff has no standing to challenge the assignment of a security deed or promissory note where the plaintiff was not a party to the assignment. *Montgomery*, 740 S.E.2d at 438. As this Court expressly noted, however, *Montgomery* only addressed a *plaintiff's* right to challenge an assignment within the context its own wrongful foreclosure claim. (*Id.* at 1354 n. 1.) "The Court does not read *Montgomery* as affecting the ability of a debtor to challenge assignments in defense to an action to collect a debt. . . ." (*Id.*). Thus, the Court left open the possibility that Alexander could challenge LSREF's affirmative claim for relief to the extent it relied on a valid assignment of the Rents to LSREF.

On May 22, 2013, LSREF and Hudson filed the instant Motion for Summary Judgment. (Mot. Summ. J., Doc. 54.) LSREF urges the Court to enter judgment in LSREF's favor on its affirmative declaratory judgment claim regarding its asserted ownership of the Rents by virtue of the ALR's automatic revocation provision or, alternatively, by virtue of LSREF's purchase of the property at the foreclosure sale. (LSREF & Hudson Br. Supp. Mot. Summ. J., Doc. 54–1.) LSREF and Hudson also argue for dismissal of Alexander's wrongful foreclosure claim against LSREF and Hudson. (*Id.*)

The Court distills the dispositive issues in this case as follows: (1) whether on the record before the Court, Hudson undoubtedly had the authority to assign the ALR to LSREF, thus entitling LSREF to immediate possession of the Rents upon default; and (2) whether a reasonable jury could conclude that LSREF or Hudson's conduct chilled the bidding at the foreclosure sale, resulting in an inadequate sales price.

## II. FACTUAL BACKGROUND

The facts described below are derived from evidence in the record, viewed in the light most favorable to Alexander as the non-movant. Although this factual background does not constitute actual findings of fact, the Court notes that the facts of this case are largely undisputed.

### A. The Loan

In 2008, Alexander SRP Apartments, LLC's ("Alexander") borrowed about $17 million from Regions to finance the development of the Odyssey Lakes Apartments in Brunswick, Georgia ("Apartment Complex"). (*See* Alexander Resp. Statement Undisputed Facts ("Alexander Resp. SUF") ¶ 1, Doc. 57.) Alexander executed a promissory note (the "Note") in favor of Regions and granted Regions a secured interest in the Apartment Complex. (*Id.* ¶¶ 1–3; Compl. Ex. A ("Note").) Pursuant to the terms of the "Deed to Secure Debt and Security Agreement" ("Security Deed"), the lender has the authority to foreclose on the Apartment Complex securing the Loan in the event of a default. (Alexander Resp. SUF ¶ 3; *see also* Pl. Mot. Summ. J. Ex. B, Doc. 54–4 ("Security Deed").) The Security Deed contains a provision authorizing the holder of the deed to sell the property "in one or more parcels or in several interests or portions and in any order or manner." (Security Deed at §§ 11.1(b), 1.3(b)(1).)

In addition, as part of this financing arrangement, Alexander signed an "Assignment of Leases and Rents" ("ALR") on February 26, 2008. (Pl. Mot. Summ. J. Ex. C ("ALR"), Doc. 54–5; Alexander Resp. SUF ¶ 5.) Pursuant to the ALR, Alexander assigned to Regions, among other things, "Rents" that it collects from tenants in the Apartment Complex.

Borrower hereby absolutely and unconditionally assigns and grants to Lender

... [a]ll rents, additional rents, revenues, income, issues and profits arising from the Leases and renewals and replacements thereof and [Alexander's] interest in any cash or security deposited in connection therewith and together with all rents, revenues, income, issues and profits ... whether paid or accruing before or after the filing by or against [Alexander] of any petition for relief under the Bankruptcy Code (collectively, the "Rents").

(ALR § 1.1(c); *see also* Alexander Resp. SUF ¶ 6.)

Regions then granted Alexander a "revocable license to collect and receive the Rents and other sums due under the Leases and Lease Guaranties." (ALR § 2.1.) Alexander was to "hold the Rents and all sums received pursuant to any Leases and Lease Guaranties, or a portion thereof sufficient to discharge all current sums due on the Debt and to pay operating expenses of the Property, in trust for the benefit of [Regions] for use in the payment of such sums." (*Id.* § 2.1.) Finally, if Alexander defaulted on the Loan, the ALR provided for an automatic, unconditional revocation of this license. (*Id.* § 3.1.)

Upon or at any time after the occurrence of a default under this Assignment which continues beyond any applicable grace, notice or cure period or an Event of Default (as defined in the Security Instrument) (a "Default"), the license granted to Borrower in Section 2.1 of this Assignment shall *automatically be revoked,* and Lender shall *immediately be entitled* to possession of all Rents and sums due under any Leases and Lease Guaranties, *whether or not Lender enters upon or takes control of the Property.*

(*Id.* (emphasis added).)

Alexander also executed an Assignment of Construction Documents ("Construction Assignment"). (Arrowsmith Decl. Ex. D ("Construction Assignment"), Doc. 54–6.) Pursuant to the terms of the Construction Assignment, Alexander assigned to Regions "all of its rights, title and interest in and to the Construction Documents." (*Id.* § 2.1.) The "Construction Documents", included, by definition any contract between Alexander and the architect for the design of improvements to the Apartment Complex and any contract between Alexander and the contractor for the construction of these improvements. (*Id.* §§ 1.1, 1.3, and 1.4.) However, according to Andrew Alexander, Alexander's general partner, Defendant Alexander SRP Apartments, LLC had no contract with an architect relating to the Apartment Complex. (Alexander Aff. ¶ 4, Doc. 56–1.) Rather, as Mr. Alexander states, the "only contract with an architect for plans and specification for Odyssey Lake Apartments is between Pucciano & English and *Alexander Properties Group, Inc.*" (*Id.* (emphasis added); Alexander Aff. Ex. A ("Architect Contract"), Doc. 56–1 at 11–20.)

To the extent a contract with an architect or contractor relating to the Apartment Complex was assigned to Regions by virtue of the Construction Assignment, Regions was also assigned the "right to enforce performance and observance of" such contract and the right to "exercise any and all rights of [Alexander] contained" in such contract. (Construction Assignment at §§ 6.3, 6.4, Doc. 54–6.)

## B. Alexander's Default and Bankruptcy

Alexander timely made all its monthly payments during the course of the loan. (Alexander Aff. ¶ 7, Doc. 56–1.) On January 26, 2011, however, when the note matured, Alexander failed to pay the amount due. (Alexander Resp. SUF ¶ 12.) According to LSREF, this failure constituted

an "event of default." (SUF ¶ 12, Doc. 54–37.) Nonetheless, Regions extended the loan for one year and entered into a Forbearance and Modification Agreement ("Forbearance Agreement").[2] (Alexander Resp. SUF ¶ 13; Arrowsmith Decl. Ex. A at 9–11, Doc. 54–3.)

A few days before the end of this forbearance period, Alexander offered to pay off the remaining loan balance but requested an additional sixty days of forbearance. (*See* Brown Dep. Exs. 7–8, Doc. 60–4 at 26–30.) Apparently, Alexander needed this additional time to obtain re-financing credit and additional capital. (*Id.;* Brown Dep. at 60, Doc. 60.) Alexander also agreed that, during this sixty-day period, Alexander would accrue interest at the default interest rate. (Brown Dep. Ex. 7 at 2–3.)

Wells Fargo, which had by this point purportedly been assigned the loan, apparently rejected this offer. (*Id.*) Internal Hudson emails from January 2012 indicate that Hudson, which was then advising the lender, believed that "[t]his [was] not a good deal" for the lender. (Brown Dep. Ex. 7, Doc. 60–4 at 26.)

> We're giving time which is critical to the borrower preserving their equity, but we're getting nothing. *No cash paydown, no fee, no deed in escrow, no control of cash flow.* If the borrower defaults in 60 days we're in the same position we're in today. We need to be getting something for the value of our time forbearance.

(*Id.* (emphasis in original).) A Hudson Director, Sebastian Brown, more specifi-

cally indicated the potential for "gain[ing] millions" in value by proceeding with a foreclosure sale, rather than accepting the payoff. "If they get a loan for $16.45 mm," he wrote in an email to Mark McCarthy, the Hudson asset manager, "then that tells me that this apartment is worth at least $19.5mm." (Brown Dep. Ex. 7, Doc. 60–4 at 27.)

> I don't understand why I am giving a forbearance on this one? I want a *full court press* and if we are paid off, then I want all default interest included as you outlined. Zero relief. If I foreclose in 2 to 3 months, then it appears to me I potentially gain millions in value above my [unpaid balance]. We should have no reservation taking this asset back. What am I getting for the forbearance that I don't already have?

(*Id.* (emphasis in original).)

In a separate exchange, one of Alexander's limited partners, Tony Saris of St. Regis Properties, offered to "pay full payout to buy the note." (Brown Dep. Ex. 9, Doc. 60–4 at 31.) In a January 23, 2012 email to Marc McCarthy of Hudson Americas, Saris stated, "I realize the note will go into default, as you can't get an answer in time, but I presume you would present our written offer." (*Id.*) Apparently, neither McCarthy nor Brown presented this offer to Hudson's Senior Vice President, Richard Arrowsmith. (*See* Arrowsmith Dep. at 56–57, Doc. 59 (testifying that the first time he learned of this particular offer was during his deposition in this case).)

---

2. Apparently, Alexander had requested a two-year extension. (*See* Alexander Aff. ¶ 10, Doc. 56–1.) Andrew Alexander, general partner of Alexander SRP Apartments, LLC, swears in his affidavit that the Regions loan officer working on his loan "indicated that the Loan would be extended a second year as well, but he could not give a single two-year exten-sion." (*Id.*) Alexander does not argue that this promise to extend the Loan for an additional year at the end of the first year of forbearance was in any way binding on Regions or its successor-in-interest. This fact is thus immaterial for purposes of the pending Motion for Summary Judgment.

The forbearance period ended on January 26, 2012, without an agreement to ward off foreclosure. (*See* Alexander Resp. SUF ¶ 14.)

In March 2012, Alexander filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of Georgia (the "Bankruptcy Court"). (Meyer Decl. ¶ 3, Doc. 54–11.) *See In re Alexander SRP Apartments, LLC,* No. 12–20272–SDB, 2012 WL 1910088 (Bankr.S.D.Ga. Apr. 20, 2012).[3] Alexander continued to collect and hold the Rents while the bankruptcy was pending. (Answer ¶ 16.) LSREF, which purportedly became the holder of the Note and all associated documents, including the ALR, the document originally granting Regions the rights to Alexander's Rents, moved for relief from the automatic stay. *In re Alexander,* No. 12–20272–SDB, slip op. at 5–6. The Bankruptcy Court granted this relief on April 20, 2012. *Id.* at 16.

## C. The Foreclosure Notice

In May 2012, LSREF notified Alexander that Alexander had defaulted on the Note and that the lender was pursuing its foreclosure remedy under the terms of the Note. The date of the foreclosure was set for June 5. (Alexander Countercl. ¶ 14, Doc. 43; Answer Countercl. ¶ 14, Doc. 44.) Then, for four weeks before this scheduled foreclosure sale, LSREF published a notice of foreclosure (the "Notice") once per week in the Brunswick News. (McCorkle Decl. ¶ 5, Doc. 54–20; *Id.* Ex. 1 ("Notice"), Doc. 54–21.)[4]

In its Order on LSREF and Hudson's Motion to Dismiss, the Court described the contents of the foreclosure notice. (Feb. 13, 2013 Ord., 15 F.Supp.3d at 1300–02, Doc. 42.) For context purposes, the Court reiterates in large part that description below.

The Notice was published as one unitary advertisement for the sale of all Alexander's collateral, both real property and personal property. (Notice.) The Notice listed 14 types of property securing Alexander's loan.[5] One type of property, "Improvements," included, among other things, "fixtures." (*Id.* at 3.) Another category of property called "Fixtures and Personal Property" also listed fixtures. (*Id.* at 3.) This section contained a collection of property that would be sold at the foreclosure sale including "machinery, equipment, fixtures (including, but not limited to, all heating and air conditioning, plumbing, lighting, communications and elevator fixtures) and other property." (*Id.* at 3.) As Alexander identifies, the definition of Fixtures and Personal Property in the Notice tracks exactly the definition of Fixtures and Personal Property contained in the Security Deed. (*See* Arrowsmith Decl. Ex. B, Art. 1 § 1.1(e), Doc. 54–4.)

A separate section of the Notice defined the term "Funds." (*Id.* at 4.) According to the Notice, "Funds" include only those funds, cash or other sums that are "held by Lender in any escrow, reserve or other accounts established under the Note, the Security Instrument, or Other Security Document if any." (*Id.* at 5.) The Notice then states that all the property listed

---

**3.** The Bankruptcy Court order is Exhibit 5 to the Declaration of William D. Meyer (Doc. 54–18).

**4.** The Notice is also attached as Exhibit D (Doc. 7–4) to the Counterclaim.

**5.** The 14 types of property included: (a) Land; (b) Additional Land; (c) Improvements; (d) Easements; (e) Fixtures and Personal Property; (f) Leases and Rents; (g) Insurance Proceeds; (h) Condemnation Awards; (i) Tax Certiorari; (j) Conversion; (k) Rights; (*l*) Agreements; (m) Intangibles; and (n) Other Rights. (Notice at 1–3.)

would be sold at the foreclosure sale "less and except Funds." (*Id.* at 4.) Nowhere does the Notice quantify the amount of cash held by or on behalf of Alexander. In any case, LSREF admits that "from May 1, 2012 through the time of the Foreclosure Sale, Plaintiff held no 'Funds' as defined in the advertisement of the Foreclosure Sale." (LSREF Resp. Alexander 1st Request for Admission ("RFA") ¶ 6, Doc. 56–6.)

Although the Notice did not separate real property from personal property, it provided that the lender could sell the property separately in this manner. (Notice at 5.) [6] The Security Deed likewise states that the lender could sell the property "in one or more parcels or in several interests or portions and in any order or manner." (Security Deed § 11.1(b); *see also* Security Deed. § 1.3(b)(1) ("In the event of a foreclosure sale, the Property may, at the option of Lender be sold as a whole...."). Pursuant to these provisions of the Notice and Security Deed, as explained in Part II.E below, LSREF split Alexander's property into two lots, one of realty and the other of personalty, and sold them separately at a June 5, 2012 foreclosure sale (the "Foreclosure Sale").

## D. Valuation

Before the Court details the events at the Foreclosure Sale, it finds it helpful to summarize relevant evidence regarding the value of the property involved in this case.

First, Alexander collected and held $372,175.25 in Rents between January 2012, the end of forebearance period, and June 5, 2012, the date of the Foreclosure Sale. (Alexander Resp. SUF ¶¶ 25, 32 Doc. 57.) Alexander refused to remit the Rents to LSREF before or after the Foreclosure Sale. (*Id.* ¶ 33.) Alexander, LSREF, and two law firms representing Alexander continued to dispute the ownership of the Rents after the foreclosure. (*Id.* ¶ 34.) These parties entered into a consent order in the Bankruptcy Court whereby the $372,175.25 in Rents would be held in escrow until the parties reached an agreement as to the Rents or a court of competent jurisdiction directed how the Rents should be distributed. (*Id.*)

Next, in the Bankruptcy Court, LSREF proffered expert appraiser testimony to appraise the value of "personal property." (Brown Dep. Ex. 14 at 4, Doc. 60–4 at 75–78.) The appraiser defined "personal property" to include refrigerators, ranges, and clubhouse furniture. (*Id.*) According to this April 2012 appraisal, the original value of the refrigerators was $208,800, the ranges was $174,000, and the clubhouse furniture was $200,000. (*Id.* at 78.) The appraiser applied a 13% depreciation reduction to reach an appraised value of $181,656, $151,380, and $174,000 respectively, for a total estimated depreciated value of $507,036. (*Id.*)

Andrew Alexander, however, points out several items not included in this expert valuation. First he asserts that the appraisal did not include a valuation for additional furniture contained in a 2–bedroom model home apartment, which according to Andrew Alexander, was worth about $30,000 at the time of the Foreclosure Sale and 1–bedroom model home unit, which was allegedly valued at $15,000. (Alexander Aff. ¶¶ 19–20, Doc. 56–1.) He then

---

6. Specifically, the Notice stated, that LSREF could "sell that portion of the Property (less and except Funds), which, under the laws of the State of Georgia, constitutes an estate or interest in real estate separately from that portion of the Property (less and except Funds), which, under the laws of the State of Georgia, constitutes personalty and not an interest in realty." (Notice at 5.)

notes that the appraiser did not include in his definition of personal property 232 dishwashers and 232 microwaves. (*Id.* ¶ 18.) Andrew Alexander does not offer a value for these items.

Andrew Alexander next avers that included in the foreclosure estate was an amount owed to the Property caused by the architect's breach of its contractual duties. (*Id.* ¶¶ 22–23.) According to Andrew Alexander, this amount was valued at $1,143,281. (*Id.*)

### E. The Foreclosure Sale

LSREF, through its legal counsel Robert McCorkle, conducted the Foreclosure Sale on June 5, 2012, (Alexander Resp. SUF ¶ 26, Doc. 57; Alexander Aff. ¶ 13, Doc. 56–1.) On the steps of the Glynn County, Courthouse, Mr. McCorkle began by reading from a foreclosure script. (McCorkle Decl. ¶ 9, Doc. 54–20; *id.* Ex. 2, Doc. 54–22.) He then read the Notice in its entirety. (*Id.* ¶ 10.) After reading the Notice, Mr. McCorkle announced that LSREF would be selling the property in two lots, one consisting of all real property as that term is defined under Georgia law, and then one consisting of personal property, as defined under Georgia law. (*Id.* ¶ 13.)[7] This decision to split the sale in two lots was based on the recommendation of Hudson's Senior Vice President Richard Arrowsmith. (*See* LSREF Resp. Alexander 1st Interrog. at 16 ¶ 3, Doc. 56–3.)

The realty was then auctioned first. (McCorkle Decl. ¶¶ 14–15, Doc. 54–20.) On behalf of LSREF, McCorkle placed a credit bid for the real property of $16,730,000. (*Id.* ¶ 14; Alexander Resp. SUF ¶ 27.) This was the only bid on the real property. (McCorkle Decl. ¶ 14.)[8]

Once the sale was complete, Mr. McCorkle turned to the auction of personal property. (*Id.* ¶ 15.) LSREF made a credit bid of $25,000 for the purchase of the personal property, based on the recommendation of Hudson's Senior Vice President, Richard T. Arrowsmith. (Alexander Resp. SUF ¶ 30; Arrowsmith Decl. ¶ 21, Doc. 54–2; *see also* Arrowsmith Decl. ¶ 18, Doc. 54–2 ("Hudson assisted LSREF in determining LSREF's opening bids for the foreclosures."). In recommending this opening bid, Arrowsmith did not include the value of any construction claims or disputed rents, as it was Arrowsmith's belief that such items were owned by the lender in advance of the foreclosure. (Arrowsmith Decl. ¶¶ 21–22.) In addition, Arrowsmith believed that the construction and design claims were "speculative and contingent in nature." (*Id.* ¶ 23.) Accordingly, even if the construction claims were part of the foreclosure estate, Arrowsmith would not have included their value in his recommendation of an opening bid. (*Id.*)

Mr. Alexander, who was present at the auction, states that he was "shocked at the

---

7. According to Andrew Alexander, Mr. McCorkle did not announce prior to the Foreclosure Sale that the property was to be split into two separate lots in this manner. (Alexander Aff. ¶ 15.) But the undisputed facts in the record show that Mr. McCorkle did make such an announcement after reading the Notice and prior to calling for bids. (McCorkle Decl. ¶ 13.)

8. Alexander states that a plane flew overhead as Mr. McCorkle was calling for final bids for the realty. (Alexander Resp. at 11 (citing 2d Meyer Decl. Ex. 8).) However, as explained

below in Part II.F, the Superior Court of Glynn County confirmed the sale of the realty, finding that it had been conducted in a manner consistent with Georgia law. The issue before this Court is instead the propriety of the foreclosure sale of the personal property, Alexander does not argue that the noise from the plane interfered with anyone's ability to hear the final call for bids for personal property. In fact, Andrew Alexander himself acknowledges he heard LSREF's opening bid. (*See* Alexander Aff. ¶ 24.)

low opening bid for the personalty." (Alexander Aff. ¶ 24, Doc. 56–1.) "Based on the low opening bid," he swears in an affidavit, "I questioned my understanding of what was included as part of the personal property and concluded that the personal property must not have included the model home furniture, the clubhouse furniture, the 232 refrigerators, the 232 electronic ranges, or the contract claims against the architect." (*Id.* ¶ 25.) Two other potential bidders were present at the foreclosure sale. (*Id.* ¶ 14.) No one other than LSREF bid on the personal property, and thus, LSREF purchased this property for $25,000.

Following the Foreclosure Sale, LSREF filed a Deed Under Power of Sale and Bill of Sale, which purports to convey the real and personal property to LSREF. (Alexander SUF ¶ 31.)

Hudson was intimately involved in LSREF"s decision to reject Alexander's offers to bring the debt current and proceed with foreclosure in the first place. However, other than deciding to split the sale into two lots and recommending the amount to bid, Hudson played *no role* in the actual Foreclosure Sale. (*See* Arrowsmith Decl. ¶ 24.) In particular, there is no evidence that Mr. McCorkle, LSREF"s lawyer who conducted the sale on LSREF"s behalf, served as an agent for Hudson during the Foreclosure Sale or at any time.

**F. Confirmation**

LSREF reported the foreclosure of real property to a judge of the Superior Court of Glynn County, Georgia ("Superior Court") for confirmation. (2d Meyer Decl. ¶ 4, Doc. 54–25.) *See LSREF2 Baron, LLC v. Alexander SRP Apartments, LLC, et al.,* No. CE12–01094–063 (Glynn Cnty., Ga.Super.Ct.) The Superior Court confirmed the foreclosure sale of real property following an October 16, 2012 hearing. (2d Meyer Decl. ¶ 5; *id.* Ex. 1 ("Super.Ct.Tr."), Doc. 54–26; *id.* Ex. 2 ("Confirmation Ord."), Doc. 54–27.) In particular the Superior Court found that (1) the foreclosure sale of real property and improvements was advertised in a manner consistent with the seller's statutory duties, (2) LSREF complied with the statutory requirements regarding regularity of the sale of realty under O.C.G.A §§ 44–14–161 and 44–14–162; (3) the real property sale was conducted in the usual manner of the sheriff's sale in Glynn County; and (4) the price paid ($16,730,000) was "equal to or greater than the 'true value'" of the real property. (Confirmation Ord. at 1–2.)

The Confirmation Order was affirmed by the Georgia Court of Appeals, (Doc. 67–5), and on January 6, 2014, the Georgia Supreme Court denied Alexander's petition for certiorari (Doc. 69–1 at 6). *See Alexander SRP Apts., LLC, et al. v. LSREF2 Baron, LLC,* No. S13C1916 (Ga. Jan. 6, 2014).

**G. Transfer of the Note and Hudson's Authority to Bind**

The Regions loan and associated security documents (including the ALR granting Regions the Rents),[9] changed hands three

---

9. All of the evidence of the Loan's transfer is specifically related to the assignment of the Loan. With the exception of the Assignment Agreement, in which Wells Fargo assigns all its interest in the Loan "and documents evidencing and/or securing and/or setting forth the terms of the Assigned Loan," (Meyer Decl. Ex. P, Doc. 54–15 at 63), none of the evidence specifically addresses whether Regions assigned its interest in the ALR, the document granting Regions an interest in the rents at issuing this case. Nonetheless, Hudson's Senior Vice President Richard T. Arrowsmith swears that LSREF in fact acquired the ALR in 2012 along with all other documents relating to the Loan. (Arrowsmith Decl. ¶ 12, Doc.

times during the history of this case before it allegedly arrived in LSREF's possession, and Hudson was involved in two of these transfers. Alexander challenges Hudson's authority in these two transfers, and thus LSREF's ultimate authority to enforce the Note's terms. Accordingly, the Court must detail the factual record regarding Hudson's role in the Loan's transfer.

Regions first sold the loan to LSREF2 Baron 2011 Trust (the "Trust") and executed an allonge assigning the note to the Trust. (Alexander Aff. ¶ 11.) Hudson did not act as a representative for Regions, and the parties do not appear to have any dispute that this transfer from Regions to the Trust was valid.

Next, the Trust, through an allonge, assigned the loan to Wells Fargo Bank, N.A. ("Wells Fargo").[10] (Arrowsmith Decl. Ex. A at 12, Doc. 54–3.) An individual named Marc Lipshy signed this allonge as Vice President of Hudson Americas LLC, "Administrator" for the Trust. (Id.)

Then on February 13, 2012, shortly after the end of the forbearance period, Wells Fargo executed an allonge purporting to assign the loan package to Plaintiff LSREF2 Baron, LLC. (Arrowsmith Decl. Ex. A at 13, Doc. 54–3.) Just like the previous allonge from the Trust to Wells Fargo, this one was signed by Hudson

Americas, LLC. Only here, Hudson is referred to as the "attorney-in-fact" for Wells Fargo. (Id.) The Hudson representative who signed the allonge was Marisa K. McGaughey as "Assistant Vice President." (Id.)

Wells Fargo also executed an "Assignment Agreement," purporting to assign "all of its rights, title and interest in the Assigned Loan" to LSREF. (Meyer Decl. Ex. P, Doc. 54–15 at 63.) Again, Ms. McGaughey executed the Assignment Agreement on behalf of the assignor Wells Fargo as the Assistant Vice President of Hudson Americas LLC, purportedly Wells Fargo's attorney-in-fact. (Id. at 65.) But Ms. McGaughey also executed the assignment on behalf of the assignee, LSREF, as Assistant Vice President of LSREF. (Id.)

The validity of these assignments from the Trust to Wells Fargo and Wells Fargo to LSREF thus depends upon Hudson's actual authority to bind the assignor each time. To support their assertion that Hudson, at all relevant times, had such authority, LSREF and Hudson attach to their reply brief two declarations of Marisa K. McGaughey, Assistant Vice President of Hudson. According to Ms. McGaughey, Hudson was in fact the Trust's administrator. (McGaughey Decl. ¶ 2, Doc. 62–2.) Likewise, Ms. McGaughey attests that on February 13, 2012, Hudson served as

---

54–2.) And documents filed in the Bankruptcy Court confirm that each Loan assignment was accompanied by an assignment of all associated agreements memorializing the Loan's secured interests, including the interest in the Rents. *See, e.g., In re Alexander SRP Apts., LLC*, No. 12–20272–LWD (Doc. 45–14). In any case, Alexander does not contest that if Hudson in fact had the authority to bind the assignees in the chain of title of the Loan, the Loan transfers would be sufficient to also assign the ALR.

**10.** Apparently, the Trust and Wells Fargo also executed an Assignment Agreement, assigning

to Wells Fargo "all of the rights, title and interest of [the Trust] in the Assigned Loans, the Assigned Loan Documents and the Other Assigned Interests." *In re Alexander SRP Apts., LLC*, No. 12–20272–LWD (Bankr. S.D.Ga. Mar. 12, 2012) (Doc. 45–13 of the Bankruptcy Court Docket). The assignment is not part of the record in this case, but was introduced in the Bankruptcy Court. Just like the allonge, however, the assignment was executed by Hudson Americans LLC as Administrator of the Trust and a Vice President of LSREF2 Baron, LLC. *Id.*

Wells Fargo's attorney-in-fact. (McGaughey 2d Decl. ¶¶ 7–8, Doc. 62–4.) Finally, Ms. McGaughey swears that as an assistant vice president, she had "full authority to sign the allonge on behalf of Hudson", (McGaughey 2d Decl. ¶ 10, Doc. 62–4), and that she was both an Assistant Vice President of LSREF, (McGaughey Aff. ¶ 2, Doc. 54–33), and the Assistant Vice President of Hudson (McGaughey Decl. ¶ 3, Doc. 62–2).

On the other hand, the summary judgment record contains no legal document unambiguously granting Hudson the authority to bind the Trust or Wells Fargo. As to the Trust, in response to Alexander's request for "all contracts between [Hudson] and [LSREF] that would govern [Hudson's] duties or undertakings with respect to the Loan, the Note, the Subject Property, or the Foreclosure Sale," Hudson produced only a December 22, 2011 "Servicing Agreement." (Alexander Resp. Ex. B at 11; Arrowsmith Dep. Ex. 10, Doc. 56–4 at 12–22 ("Servicing Agreement").) Pursuant to this Servicing Agreement, Hudson, as "Manager" for LSREF and the Trust, assumed responsibility for "day-to-day communication and coordination" with LSREF's and the Trust's personnel or other service providers it hired. (Servicing Agreement ¶ 1.) But LSREF and the Trust "retain[ed] the sole right ... to approve any transaction with respect to" their assets. (*Id.*) Thus, this Servicing Agreement does not grant Hudson the authority to approve transactions for the Trust.

■ LSREF and Hudson do direct the Court to a "Limited Power of Attorney," dated December 19, 2011, pursuant to which Wells Fargo granted Hudson the authority to sign the February 13, 2012 allonge from Wells Fargo to LSREF. (LSREF & Hudson Reply Ex. C, Doc. 62–3.) But this document, attached to LSREF and Hudson's reply brief, was not previously produced during discovery despite a request seeking any "contract between [Hudson] and any third party, other than [LSREF], that would govern [Hudson's] duties or undertakings with respect to the Loan." (*See* Hudsons Resp. Request for Prod. No. 12, Doc. 56–2 at 11.) Accordingly, the Limited Power of Attorney is not part of the record on LSREF and Hudson's Motion for Summary Judgment.[11] And even if it were, no similar

---

11. On the other hand, Ms. McGaughey's declarations attached to LSREF and Hudson's Reply brief may be considered on summary judgment. The Court rejects Alexander's argument, made in its Motion to File Surreply, that the Court should disregard Ms. McGaughey's declarations. (Surreply at 2, Doc. 63.) It is true that a party cannot rely on an affidavit of a witness who was not previously identified as a witness with relevant knowledge unless the failure to identify that witness was substantially justified or harmless. *See* Fed.R.Civ.P. 37(c)(1). But Alexander does not argue that Ms. McGaughey was not previously identified in Hudson or LSREF's initial disclosures or subsequent disclosures. In fact, Ms. McGaughey was identified in exhibits to LSREF's Complaint filed in July 2012. (*See, e.g.,* Compl. Ex. A at 12–13, Doc. 1.) And the Court may consider declarations attached to a Reply brief filed in response to specific challenges asserted in a response brief, particularly when the respondent has an opportunity to respond to the declarations. *See Lightsey v. Potter*, 268 Fed.Appx. 849, 852 (11th Cir.2008) (affirming a district court's reliance on declarations attached to a reply brief filed in response to challenge to a document's authenticity and noting that the respondent failed to request leave to file a surreply or supplemental appendix in response to the new declaration); *see, e.g., First Citizens Bank & Trust Co., Inc. v. Hwy 81 Venture, LLC*, No. 1:10–cv–02126–JEC, 2012 WL 779894, at *5 (N.D.Ga. Mar. 6, 2012) (Carnes, C.J.) (relying on a supplemental affidavit attached to a reply brief that cures foundational defects in the original testimony and confirm the declarant's role as an officer of the plaintiff bank). As noted above, however, the Court agrees that the previously unproduced Limited Power of Attorney cannot be treated as part of the

document exists in the record granting Hudson the authority to bind the Trust.

Moreover, in deposition, Hudson's corporate designee Richard Arrowsmith confirmed that "no one at Hudson America has the authority to bind—the owner of the note because the authority is vested with the owner of the note." (Arrowsmith Dep. at 9, Doc. 59; *see also* Servicing Agreement ¶ 12 ("The relationship between [Hudson and LSREF or the Trust] [was] that of independent contractors...."); McGaughey Decl. ¶¶ 5–6, Doc. 54–33 (confirming that Hudson acts as an independent contractor and LSREF's agent "in connection with collecting amounts due under the loans being serviced, including the loan at issue in this case").)

In summary, the summary judgment record allows for the inference that Hudson did not have the authority to bind the Trust or Wells Fargo, calling into question the validity of the assignment of the loan and associated documents to LSREF.

### III. LEGAL STANDARD

The Court must grant summary judgment if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual issue is material if resolving the factual issue might change the suit's outcome under the governing law. *Id.* The motion should be granted only if no rational fact finder could return a verdict in favor of the non-moving party. *Id.* at 249, 106 S.Ct. 2505.

summary judgment record under the circum-

When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets this initial burden, in order to survive summary judgment, the non-moving party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial. *Id.* at 324–26, 106 S.Ct. 2548. The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

### IV. ANALYSIS

#### A. LSREF's Claim Against Alexander

LSREF's sole substantive claim against Alexander in this action is one for declaratory relief regarding its entitlement to the Rents. LSREF argues that it is entitled to summary judgment on this claim for two reasons. First, according to LSREF, it owns the Rents "because Alexander executed an agreement that irrevocably assigns all rents, security deposits and other income generated by the apartment complex in Brunswick, Georgia that secured the loan to the lender or its successor in interest." (LSREF and Baron's Br. Supp. Mot. Summ. J. at 2, Doc. 54–1.) Second,

stances presented here.

LSREF argues that it is entitled to the Rents by virtue of the foreclosure. Neither argument entitles LSREF to summary judgment.

### 1. The ALR

■ Pursuant to the terms of the ALR, Alexander assigned to Regions the "Rents" that it collects from tenants in the Apartment Complex. (ALR § 1.1(c); Alexander Resp. SUF ¶ 6, Doc. 57.) Regions then granted Alexander a "revocable license to collect and receive the Rents and other sums due under the Leases and Lease Guaranties." (Id. § 2.1.) Alexander was to "hold the Rents . . . in trust for the benefit of [Regions] for use in the payment of" Alexander's debt to Regions in the event of a default. (Id. § 2.1.) And if Alexander defaulted on the Loan, the ALR provided for an automatic revocation of this license. (Id. § 3.1.)

Thus, consistent with the terms of the ALR, the moment Alexander defaulted, its license to collect and receive Rents was revoked, and the Rents were due to Regions. See Frank S. Alexander, *Georgia Real Estate and Foreclosure Law* § 3.3 (2010) ("If a deed to secure debt contains an express assignment of rents, conditioned upon an event of default, and no further action is required of the creditor, a debtor who receives and retains such rents is liable for them to the creditor." (citing *Padgett v. Butler*, 84 Ga.App. 297, 66 S.E.2d 194 (1951); *In re Jones*, 77 B.R. 981 (Bankr.M.D.Ga.1987))).

■ Alexander's challenge to LSREF's claim to rents by virtue of the ALR is based on its assertion that LSREF has failed to unquestionably establish that it was actually assigned the ALR. Indeed, under Georgia law, generally only the one with the legal interest in the contract may bring an action to enforce it. (O.C.G.A. § 9–2–20; *see, e.g., Hutto v. CACV of Colorado, LLC*, 308 Ga.App. 469, 707 S.E.2d 872, 874 (2011); *Green v. Cavalry Portfolio Serv., LLC*, 305 Ga.App. 843, 700 S.E.2d 741, 742 (2010); *Wirth v. Cach, LLC*, 300 Ga.App. 488, 685 S.E.2d 433, 435 (2009)).

■ Although one may assign to another its contractual rights, such assignment "must be in writing in order for the contractual right to be enforceable by the assignee." *Hutto v. CACV of Colorado, LLC*, 308 Ga.App. 469, 707 S.E.2d 872, 874 (2011) (reversing summary judgment because the evidence in the record was insufficient to establish a valid assignment; *Green*, 700 S.E.2d at 742 ("In the absence of evidence showing that [the plaintiff] received a valid assignment of contract rights making it the real party in interest to sue on the contract, the trial court erred in granting summary judgment in favor of [the plaintiff].")). An assignment executed by one without the authority to bind the assignor is not a valid assignment. *See, e.g., Jackman v. Hasty*, No. 1:10–cv–2485–RWS, 2011 WL 854878, at *2 (N.D.Ga. Mar. 8, 2011) (explaining that because it was unclear whether the person who signed the assignment had the authority to bind the assignor, it was not clear that such assignment was valid).

■ According to LSREF, Regions first sold the loan and associated documents, including the ALR, to the Trust, the Trust then assigned the ALR to Wells Fargo, and Wells Fargo finally assigned it to LSREF. But the assignment from the Trust to Wells Fargo and Wells Fargo to LSREF were both executed by Hudson, and the record is not clear whether Hudson had the authority to bind the assignor each time. On one hand, Marisa K. McGaughey, Assistant Vice President of Hudson, swore in her declaration that Hudson had such authority. (McGaughey Decl. ¶ 2, Doc. 62–2; McGaughey 2d Decl. ¶ 10, Doc. 62–4.) On the other hand, Hud-

son's own corporate designee, Richard Arrowsmith, testified that "no one at Hudson America has the authority to bind—the owner of the note because the authority is vested with the owner of the note." (Arrowsmith Dep. at 9, Doc. 59; *see also* Servicing Agreement ¶ 12 ("The relationship between [Hudson and LSREF or the Trust] [was] that of independent contractors. . . ."); McGaughey Decl. ¶¶ 5–6, Doc. 54–33 (confirming that Hudson acts as an independent contractor and LSREF's agent "in connection with collecting amounts due under the loans being serviced, including the loan at issue in this case").) LSREF has come forth with no document clearly authorizing Hudson to bind the Trust or Wells Fargo. Accordingly, LSREF is not entitled to summary judgment on this basis.

LSREF relies on *Montgomery v. Bank of America* to argue that because Alexander was not a party to the assignments, it has no standing to challenge the assignments. This argument is misplaced. As already discussed, in *Montgomery,* the Georgia Court of Appeals held that a wrongful foreclosure plaintiff has no standing to challenge the assignment of loan documents from its lender to a third-party because the plaintiff was not a party to the assignment. *Montgomery,* 740 S.E.2d at 438; *accord Edward v. BAC Home Loans Servicing, L.P.,* 534 Fed.Appx. 888, 890–91 (11th Cir.2013). But there, the debtor-plaintiff challenged the assignment of his loan to the bank as a basis for obtaining affirmative relief in his own wrongful foreclosure action. Here, on the other hand, Alexander challenges the assignment as a defense. It is LSREF who has the burden of proving its case, and as one seeking to recover on the ALR, LSREF has the burden of establishing that it has the legal authority to do so. *See Hutto,* 707 S.E.2d at 874 (reversing a grant of summary judgment in favor of the lender because

the "evidence, even together with the reasonable inferences from it, was insufficient to establish a valid assignment of rights to [the lender]" (quoting *Nyankojo v. N. Star Capital Acquisition,* 298 Ga.App. 6, 679 S.E.2d 57 (2009))); *Green,* 700 S.E.2d at 742 (same); *Wirth,* 685 S.E.2d at 435 (same). Accordingly, *Montgomery* has no bearing on the Court's decision regarding the ALR.

■ LSREF also argues that the Bankruptcy Court's findings on LSREF's Motion to Lift the Automatic Stay have collateral estoppel effect on the issue of LSREF's status as the assignee of the ALR and other Loan Documents. (LSREF & Hudson's Reply at 7, Doc. 62; *see also* LSREF & Hudson Statement Undisputed Facts ("SUF") ¶ 20.) The doctrine of collateral estoppel only serves to preclude relitigating issues that were actually litigated in the first place. *See Cleland v. Gwinnett Cnty.,* 226 Ga.App. 636, 487 S.E.2d 434, 436 (1997) (holding that where an issue was uncontested in a prior proceeding, it was not actually litigated for purposes of collateral estoppel). According to LSREF, the Bankruptcy Court "determined that the assignments were proper and that LSREF was the holder [of the Note and ALR]" and thus Alexander is collaterally estopped from arguing otherwise in this case. (LSREF & Hudson Reply at 7.) But the issue of whether LSREF was actually assigned an interest in the ALR was not actually litigated in the Bankruptcy Court. Instead, the parties stipulated to LSREF's status as secured creditor. *See In re Alexander SRP Apts., LLC,* No. 12–20272, slip op. at 2, 2012 WL 1910088 (Bankr.S.D.Ga. Apr. 20, 2012) (reciting verbatim the parties joint stipulation of undisputed facts including the fact that the Trust assigned the Loan to Wells Fargo and Wells Fargo assigned it to LSREF). The fact that Alexander

previously stipulated to LSREF's status as holder of the loan document may be additional evidence supporting an inference that LSREF had actually been assigned the ALR, but this stipulation itself does not have a collateral estoppel effect here.

■ Finally, in its Motion to File a Surreply Brief, Alexander suggests that even if LSREF had been assigned the interests in the ALR, the ALR's revocation provision was not automatic and instead, the lender would have to foreclose on the Rents before it would be entitled to them. (*See* Alexander Mot. Surreply at 5, Doc. 63.) To support this argument, Alexander relies on *In re Polo Club Apartments Ltd. Partnership,* 150 B.R. 840, 850–51 (N.D.Ga.1993), but *Polo Club* is inapposite. In *Polo Club,* a bankruptcy court held that, before the lender was entitled to possession of rents pursuant to an assignment of rents, the lender had to take possession of the property through foreclosure. *Id.* at 851–52. There, however, the assignments of rents was "clearly conditional." *Id.* at 851. Specifically, the assignment provided that "[u]pon the occurrence of … an event of default … then *and thereupon the Lender may:* (a) declare the total indebtedness due by Borrower to Lender, secured by this assignment, immediately due and payable; (b) *proceed to enter upon, take possession of, and operate the Premises under this assignment without a mortgage in possession ….*" *Id.* at 851 n. 11 (emphasis in the bankruptcy court decision).

■ In contrast, the assignment of rents here from Alexander to Regions was unequivocally unconditional, providing for automatic revocation of Alexander's license to collect Rents and the lender's immediate entitlement to the possession of all Rents, "whether or not Lender enters upon or takes control of the Property." (Pl. Mot. Summ. J. Ex. C ("ALR") § 3.1,

Doc. 54–5.) Under Georgia law, parties are free to "specify[ ] the steps that a grantee must take to enforce its interest in rents" and here, the parties have agreed to the lender's unconditional, immediate possession of rents upon default. *Matter of May,* 169 B.R. 462, 470 (Bankr.S.D.Ga. 1994) (declining to follow the reasoning of *In re Polo Club,* stating that the "better approach under Georgia law is to preserve the parties' freedom in contract in specifying the steps that a grantee must take to enforce its interest in the rents"); *accord Padgett,* 84 Ga.App. 297, 66 S.E.2d 194, 196 (1951) ("The allegation of the written assignment by the owner of the property of the rents therefrom in the event of a default under the terms of the security deed, together with the allegation that the debt secured remained unpaid at all times therein referred to, was sufficient to show a default and to establish the plaintiff's right to the rents."); *In re Jones,* 77 B.R. 981 (Bankr.M.D.Ga.1987) (holding that if the parties contract for an unconditional assignment of rents upon default, no further action by the creditor is necessary after default to entitle the creditor to any rents collected and relying on *Padgett,* which it found to be "the only Georgia case involving an assignment of rents clause *which did not by its terms require further action by the secured party to perfect its interest in the rents* " (emphasis added)). The Court is thus persuaded that Alexander's license to the Rents was automatically revoked upon the expiration of the forbearance period in January 2012.

### 2. The Foreclosure

■ LSREF argues in the alternative that if it was not assigned the Rents pursuant to the ALR, it would be entitled to the Rents by virtue of the foreclosure action. The Court, however, is persuaded that the terms of the ALR are clear. At

the moment of default, Alexander's license to collect rents was revoked, and all Rents collected thereafter belong to Regions or its assignee or transferee. The record is clear that Regions sold its interest to the Trust. Thus, if the Trust failed to actually transfer its interest in the ALR to Wells Fargo, then the Trust would be entitled to the Rents. But even if the assignment were invalid, the validity of the original ALR is unquestioned. Accordingly, the Rents were not part of the foreclosure estate and LSREF is not entitled to collect them simply by virtue of its purchase of the estate at the foreclosure sale.[12]

### 3. Conclusion

The holder of the ALR, pursuant to its plain terms, was entitled to immediate possession of the Rents upon default, and the undisputed facts in the record demonstrate that Alexander defaulted on the loan. Regions assigned its interest in the ALR to the Trust, and no party has questioned this assignment. However, the record does not unequivocally establish that the ALR was legally assigned from the Trust to Wells Fargo or from Wells Fargo to Plaintiff because both assignments were executed by Hudson on behalf of the assignor, and the record lacks sufficient evidence that Hudson had the authority to effectuate these assignments. In particular, LSREF and Hudson have presented no legal document that unequivocally establishes Hudson's authority to assign the Trust's interest in the ALR to Wells Fargo. And aside from a the "Limited Power

of Attorney" attached to LSREF and Hudson's Reply brief, which is not properly part of the summary judgment record, LSREF and Hudson have presented no legal document establishing Hudson's authority to assign Wells Fargo's interest in the ALR to LSREF. Moreover, reasonable jurors could differ as to whether Hudson actually had such authority, based on the evidence in the record, as even Hudson's corporate designee testified that Hudson had no authority to bind the lender at any time. Accordingly, the Court **DENIES** LSREF's Motion for Summary Judgment on its claim against Alexander.[13]

### B. Alexander's Amended Counterclaim

LSREF has also moved for summary judgment on Alexander's Counterclaim, which asserts only one substantive claim of wrongful foreclosure against LSREF and Hudson. (Am. Countercl. Count 1, Doc. 43.) According to Alexander, LSREF and Hudson breached their duty to exercise the power of sale fairly. LSREF and Hudson move for summary judgment on this claim, arguing first that Hudson was not the foreclosing party and did not otherwise participate in the foreclosure, and thus, cannot be liable on a theory of wrongful foreclosure. (LSREF & Hudson Br. Supp. Mot. Summ. J. at 4, Doc. 54–1.) They then argue on the evidence that Alexander fails to support his claim, and in particular has put forth no evidence of damages, an essential element of a wrong-

---

12. As discussed below in Part IV.B.2.b, however, LSREF's position in the bankruptcy court that the Rents were part of the foreclosure estate suggests that LSREF believed this to be so, and provides additional evidence that LSREF acted wrongfully by bidding a grossly inadequate amount of $25,000 for personal property it believed was worth well over $350,000.

13. The Court notes, that even if the Trust failed to assign its interest in the ALR to Wells Fargo, there is no evidence in the record— and no argument by either party—questioning Regions's assignment of the ALR to the Trust. Thus, the Trust may arguably be entitled to the Rents, and the Court is unaware of any reason why the Trust cannot now assign its interest in the Rents to LSREF.

ful foreclosure claim. They also argue that the affirmed confirmation order bars Alexander from relitigating issues regarding the manner of sale in this case. The Court considers each argument in turn.

### 1. Hudson as a Defendant

█ LSREF and Hudson assert in their Motion for Summary Judgment that Hudson was not involved in the foreclosure and thus not subject to liability on Alexander's wrongful foreclosure claim. Alexander disagrees, pointing to what it argues are issues of fact in the record resulting in a jury question as to whether Hudson was in fact involved in the foreclosure sale.

█ An agent of the secured creditor may be liable in a wrongful foreclosure action. *McCarter v. Bankers Trust Co.*, 247 Ga.App. 129, 543 S.E.2d 755, 756–57 (2000). Thus, for example, where a lawyer for the creditor conducts the foreclosure sale, the lawyer may be a proper defendant to sue. *Id.*

Here, however, the only evidence of Hudson's role in the foreclosure sale is as a behind-the-scenes advisor. For example, according to LSREF, Hudson's Senior–Vice President Richard Arrowsmith was responsible for LSREF's decision to bid $25,000 at the foreclosure sale and split the foreclosure estate into two lots. (LSREF Resp. Alexander 1st Interrog. at 16 ¶ 3, Doc. 56–3.) And although LSREF contends that Hudson had "full power of attorney for LSREF," (*id.* ¶ 6), there is no evidence that Hudson acted within this power at the foreclosure sale. On the contrary, the only evidence in the record shows that LSREEF conducted the foreclosure sale through its lead counsel Robert McCorkle. (Alexander Resp. SUF ¶ 26, Doc. 57; Alexander Aff. ¶ 13, Doc.

56–1.) LSREF might have taken Hudson's advice, and this advice might have been misguided, but it is LSREF, not Hudson, who is responsible for doing so.

The Court recognizes that, during negotiations with Alexander, Hudson apparently acted as the lender's agent. In particular, Hudson acted on behalf of Wells Fargo when in January 2012, it rejected Alexander's request for an additional sixty days of forbearance so that Alexander could gather capital to pay off the remaining balance. Hudson also acted as Wells Fargo's agent when it apparently declined to present Wells Fargo with a last-minute offer by Tony Saris, a limited partner of Alexander, to "pay full payout to buy the note." But Alexander makes no argument that Hudson or Wells Fargo owed Alexander any duty to grant additional forbearance or consider Saris's offer, and no argument that by declining to do so, Wells Fargo or Hudson breached a duty owed to Alexander. Accordingly, the Court finds that Hudson's conduct during the negotiations, although perhaps unwise, is largely irrelevant to Alexander's wrongful foreclosure claim premised on bid-chilling.[14]

To the extent Alexander has a wrongful foreclosure claim in this case, there is no evidence to support such a claim against Hudson. Thus, LSREF and Hudson's Motion for Summary Judgment is **GRANTED** to the extent it seeks to drop Hudson as a Third–Party Defendant.

### 2. The Wrongful Foreclosure Claim

LSREF and Hudson next argue that Alexander's wrongful foreclosure claim is meritless on three grounds. First, LSREF and Hudson argue that the issue of whether the foreclosure sale was *fairly executed* has already been finally deter-

---

14. The Court is in no position to assess whether Hudson could be liable to LSREF for its work on the Alexander account.

mined by a court of competent jurisdiction and thus Alexander cannot re-litigate that issue here. Second, according to LSREF and Hudson, the undisputed facts in the record, show that the foreclosure sale was conducted fairly. Second Finally, LSREF and Hudson claim that Alexander has failed to put forth any evidence of damages, a necessary element of any wrongful foreclosure claim. The Court considers each argument in turn.

### a. Collateral Estoppel

■ LSREF and Hudson assert the doctrine of collateral estoppel to argue that the state confirmation decision, which was made final when the Georgia Supreme Court denied certiorari, serves to bar litigating here whether the sale of personal property was properly conducted. The doctrine of collateral estoppel, or issue preclusion, bars relitigating certain issues that were actually litigated in a previous case. *Cmty. State Bank v. Strong*, 651 F.3d 1241, 1264 (11th Cir.2011). The Eleventh Circuit has distilled Georgia law on collateral estoppel into several elements.

> A party seeking to assert collateral estoppel under Georgia law must demonstrate that (1) an identical issue, (2) between identical parties, (3) was actually litigated and (4) necessarily decided, (5) on the merits, (6) in a final judgment, (7) by a court of competent jurisdiction.

*Strong*, 651 F.3d at 1264. Thus, collateral estoppel does not apply unless the issue in the current action was actually litigated and necessarily decided in the former. *Id.*

■ LSREF and Hudson maintain that because the foreclosure sale was advertised using a single notice, and because there was only "a single foreclosure sale," the confirmation order serves to "collaterally estop Alexander from re-litigating the fairness of the manner in which the foreclosure sale was conducted." (LSREF &

Hudson Reply at 13, Doc. 62.) LSREF and Hudson's collateral estoppel argument fails, however, because the specific bid-chilling issue that Alexander asserts now is not identical to any issues at stake that were actually litigated and resolved in the confirmation proceeding. "Georgia's statutory confirmation proceeding is extremely limited in scope." *Walton Motor Sales, Inc. v. Ross*, 736 F.2d 1449, 1455–56 (11th Cir.1984) (citing O.C.G.A. § 44–14–161). "The [confirmation] statute does not apply to sales of personalty, and the confirmation court is without authority to address matters concerning sales of personalty, even if they are related to the sale of realty." *Id.* Moreover, although the foreclosure sale was advertised in one notice, LSREF actually sold the real property separately from the personal property. Accordingly, any issue regarding the regularity of the sale of the personal property, even if related to the sale of the real property, was not before the Superior Court for confirmation and thus not actually decided for collateral estoppel purposes.

In addition, the precise factual issues relevant to Alexander's wrongful foreclosure claim were not precisely raised during the confirmation proceeding. LSREF and Hudson point to only two excerpts from the confirmation transcript in which counsel for Alexander argued that the foreclosure sale was inconsistent with the regularity requirement under Georgia law. (LSREF & Hudson Br. Supp. Mot. Summ. J. at 18, Doc. 54–1 (citing Meyer Decl. Ex. 1, Doc. 54–26).) Neither of these excerpts show that Alexander argued that the bids on personal property were chilled based on the totality of LSREF's conduct at the sale. And in any case, the four-page confirmation order gives no indication that the bid-chilling issues, or any issues related to the sale of the personal property, were actually decided by the Superior Court.

(*See* 2d Meyer Decl. Ex. 2 ("Confirmation Ord."), Doc. 54–27.) Accordingly, the doctrine of collateral estoppel does not preclude Alexander from proceeding on its wrongful foreclosure claim here.

### b. Bid–Chilling Evidence

 LSREF and Baron also challenge Alexander's wrongful foreclosure claim premised on the alleged impropriety of the sale of personal property. According to LSREF and Baron, the undisputed facts in the record show that the conduct of the sale was consistent with the Georgia legal requirement that the sale be conducted fairly.

In response, Alexander argues that Baron and Hudson's conduct "chilled the bidding" at the sale, resulting in a grossly inadequate sales price. (Alexander Resp. at 23–24, Doc. 56; *see* Am. Countercl. ¶¶ 63–81.) The heart of Alexander's wrongful foreclosure claim is that LSREF and Baron failed to exercise the power of sale fairly by (1) suddenly splitting the property into a personal property lot and a real property lot and announcing a confusing definition of "Fixtures and Personal Property"; (2) failing to announce that the valuable construction claims, refrigerators and ranges were included in the personal property lot; and (3) asserting a low opening bid that was grossly inadequate, falsely signaling to all potential buyers that the personal property had minimal value. According to Alexander, this misconduct had a bid-chilling effect.

 "In Georgia, a plaintiff asserting a claim of wrongful foreclosure must establish a legal duty owed to it by the foreclosing party, a breach of that duty, a causal connection between the breach of that duty and the injury it sustained, and damages." *Racette v. Bank of Am., N.A.,* 318 Ga.App. 171, 733 S.E.2d 457, 462 (2012) (quoting *Gregorakos v. Wells Fargo Nat. Assn.,* 285 Ga.App. 744, 647 S.E.2d 289,

292 (2007)). The foreclosing party breaches its legal duty if it fails to "exercise the power of sale fairly and in good faith." O.C.G.A. § 23–2–114. *See Racette,* 733 S.E.2d at 462 (citing O.C.G.A. § 23–2–114).

 The Court has previously explained what is required to prove bid-chilling in support of a wrongful foreclosure claim, (Feb. 13, 2013 Ord., 15 F.Supp.3d at 1306–07, Doc. 42), and reiterates that explanation here. A claim of "chilling the bidding" arises from evidence that the foreclosing party's conduct (perhaps in combination with the conduct of others) suppressed the bidding at a foreclosure sale. *Little v. Fleet Fin.,* 224 Ga.App. 498, 481 S.E.2d 552, 557 (1997) ("What is forbidden is a prior agreement or understanding that is in any manner *outcome determinative,* i.e., impacts on the amount of the highest bid or the identity of the successful bidder so as to chill either the bidding or the sale's price . . . .").

 To prevail on a wrongful foreclosure claim premised on alleged bid-chilling, the debtor must prove (1) a grossly inadequate price and (2) conduct that amounts to fraud, mistake, misapprehension, surprise or similar behavior. *Giordano v. Stubbs,* 228 Ga. 75, 184 S.E.2d 165, 168–69 (1971); *Brown v. Freedman,* 222 Ga.App. 213, 474 S.E.2d 73, 76 (1996); *Kennedy v. Gwinnett Commercial Bank,* 155 Ga.App. 327, 270 S.E.2d 867, 871–74 (1980). Inadequacy of price alone is insufficient to sustain a claim for wrongful foreclosure. *Giordano,* 184 S.E.2d at 168–69; *Kennedy,* 270 S.E.2d at 873–74; *Vieira v. CitiGroup, Inc.,* No. 1:12–CV–1636–TWT, 2013 WL 275581, at *5–6 (N.D.Ga. Jan. 23, 2013) (Thrash, J.). In evaluating bid-chilling claims such as Alexander's, the Court should consider all the circumstances. *Brown v. Freedman,* 222 Ga.App. 213, 474 S.E.2d 73, 76 (1996) ("It is the 'circum-

stances' in conjunction with the price, that can lead to a recovery.").

Alexander has pointed to evidence in the record from which a reasonable jury could conclude that LSREF's conduct at the foreclosure sale chilled the bidding. First, a reasonable jury could conclude that the sales price of $25,000 for the personal property, which included at least $174,000 worth of clubhouse furniture, was grossly inadequate. (*See* Brown Dep. Ex. 14 at 4, Doc. 60–4 at 75–78 (stating the depreciated value of clubhouse furniture at $174,000).) *See Hall v. White*, 215 Ga. 144, 109 S.E.2d 516, 518 (1959) (holding that a bid of $600 for property valued at about three times that amount ($2,000) is grossly inadequate).

▮▮ Second, a reasonable jury could decide, from the evidence in the record, that LSREF conducted the sale in a manner meant to mislead buyers into thinking the personal property was worth far less than it was. LSREF did not disclose until moments before the sale that it was invoking its right to split the property into two lots, and did not give potential buyers any indication that the personal property was worth upwards of $174,000. (*See* McCorkle Decl. ¶ 13–15.) These facts alone

would be insufficient to find that LSREF acted unfairly, but Alexander also points to evidence in the record showing that LSREF knew, before the sale, that the personal property was worth at least $174,000. (Brown Dep. Ex. 14 at 4, Doc. 60–4 at 75–78.) Moreover, LSREF's position in the bankruptcy court that the Rents were actually part of the foreclosure estate suggest that LSREF also believed, albeit wrongly, that Rents valued at over $370,000, were part of the personal property to be sold at the sale. (Alexander Mot. File Surreply Ex. A at 10–11, Doc. 63–1.) [15] *See Polo Club*, 150 B.R. at 845 ("Accrued rents are personalty under Georgia law."). Thus, a reasonable jury could infer that LSREF believed the personal property to be sold at the foreclosure sale was worth over $540,000. Offering a grossly inadequate bid of $25,000 under these circumstances could rise to the level of bid-chilling. Accordingly, LSREF is not entitled to summary judgment based on its conduct at the foreclosure sale.[16]

### c. Damages

LSREF and Hudson finally argue that Alexander cannot proceed to trial on its wrongful foreclosure claim because it failed to put forth proof of damages. This

---

15. LSREF also maintained in the alternative, as it does here, that it was entitled to the rents by virtue of the assignment of rents. (Alexander Mot. File Surreply Ex. A at 11 n. 2, Doc. 63–1.)

16. It is not clear whether LSREF also argues that Alexander failed to produce evidence of causation. Indeed, as the Court has previously explained, even if a debtor can prove misconduct at the foreclosure sale, it must satisfy the remaining elements of a wrongful foreclosure claim, namely that the conduct caused the debtor an injury. *See, e.g., Heritage Creek Dev. Corp. v. Colonial Bank*, 268 Ga.App. 369, 601 S.E.2d 842, 844–45 (2004) (affirming grant of summary judgment where a bid-chilling claim failed to show a causal connection between Defendant's conduct and

the alleged injury). Accordingly, the debtor must come forward with evidence from which a reasonable jury could infer that someone was discouraged from bidding on the property because of the foreclosing party's wrongful conduct. *Id.* Here, the undisputed evidence shows that two other bidders were present at the sale but did not place a bid on the personal property and that Mr. Alexander himself was confused about the value of the personal property. (Alexander Aff. ¶¶ 14, 24–25, Doc. 56–1; McCorkle Decl. ¶ 15, Doc. 54–20.) A reasonable jury could infer from this evidence that LSREF's conduct at the sale dissuaded these two other individuals from placing a substantially higher bid on the personal property.

is not so. The record contains evidence that the personal property was worth at least $174,000, but was sold for only $25,000. Assuming Alexander can prove all other elements of its wrongful foreclosure claim, it has sufficient evidence to prove damages. Moreover, as LSREF and Hudson concede, Alexander could proceed on its claim to recover nominal damages. (LSREF & Hudson Br. Supp. Mot. Summ. J. at 21, Doc. 54–1 (citing *Hodsdon v. Whitworth*, 173 Ga.App. 863, 328 S.E.2d 753, 754 (1985)).)

 LSREF and Hudson are correct, however, that Alexander's damages are limited based on the summary judgment record and Georgia law. Should Alexander prevail on its wrongful foreclosure claim arising out of the sale of the personal property, its damages would be the difference between the fair market value of the property at the time of the sale and the $25,000 the sale actually brought in, and this damages award would go towards reducing Alexander's deficiency on the note. *See Roylston v. Bank of America, N.A.,* 290 Ga.App. 556, 660 S.E.2d 412, 417 (2008).

The parties appear to agree that the clubhouse furniture and model home furniture was part of the personal property sold at the foreclosure sale. (*See* LSREF & Hudson Br. Supp. Mot. Summ. J. at 24–25, Doc. 54–1 ("[T]he only personalty included within the lot sold at the foreclosure sale included office equipment, exercise equipment, patio furniture, and some furniture included within a model apartment."); LSREF & Hudson Reply at 13 (arguing only that Alexander has no evidence of the value of the clubhouse furniture and model home furniture, not that such items were real property sold along with the real property lot at the foreclosure sale); Alexander Resp. at 17–18, Doc. 56 ("At a minimum, the personal property included $174,000 in clubhouse furniture....").) LSREF's only apparent argument that the value of this property cannot be included in an assessment of damages is its assertion that Alexander failed to identify evidence of the value of this property.[17] This is not so. Evidence in the record supports that the clubhouse furniture's fair market value at the time of the foreclosure sale was $174,000. And Mr. Alexander attests that in his experience, the model home furniture had a value of $45,000 at the time of the foreclosure sale, for a total of $219,000. The record, therefore, is not devoid of evidence supporting a damages claim up to $194,000 ($219,000 minus $25,000).

The parties disagree, however, whether the personal property sold at the sale included (1) refrigerators and ranges, (2) dishwashers and microwaves, and (3) a breach of contract claim against the architect.[18]

Alexander first argues that the personal property included thousands of dollars worth of refrigerators and ranges, and in response, LSREF asserts that these items were fixtures under Georgia law and those sold along with the real property. As the Court previously noted in its Order on LSREF and Baron's Motion to Dismiss Alexander's Counterclaim, what was sold as realty at the foreclosure sale included

---

17. Apparently, some of the model home furnishing "did not even belong to Alexander," (Alexander Resp. at 24, Doc. 56 (citing Arrowsmith Dep. Ex. 23, Doc. 59–5 at 24).) At trial, Alexander will have to provide sufficient evidence that the $45,000 worth of model home furniture was attributed to the furniture that was part of the personal property securing its loan.

18. The Court rejected Alexander's argument that Rents were part of the personal property sold at the foreclosure sale in Part IV.A above.

anything defined as realty under Georgia law. (*See* Feb. 13, 2013 Ord., 15 F.Supp.3d at 1306, Doc. 42; Notice at 5.) Specifically, the foreclosure notice provided that "Lender may elect and may sell that portion of the Property, ... which, under the laws of the State of Georgia, constitutes an estate or interest in real estate separately from that portion of the Property, ... which, under the laws of the State of Georgia, constitutes personalty and not an interest in real estate." (Notice at 5.)

■ Under Georgia law, a fixture is "[a]nything which is intended to remain permanently in its place even if it is not actually attached to the land ... [and] constitutes a part of the realty." O.C.G.A. § 44–1–6; *see also Nat'l Community Builders, Inc. v. Citizens & S. Nat. Bank*, 232 Ga. 594, 207 S.E.2d 510, 512–13 (1974) ("The term 'real estate' as used in [Georgia's] foreclosure and confirmation statutes is a fixed legal concept, and when realty is described by metes and bounds and sold, then the sale includes all improvements that are 'part of the realty.'"). "Attachment and removability as well as the parties' intent, are relevant factors in determining whether an item of personalty is a fixture." Frank S. Alexander, *Georgia Real Estate and Foreclosure Law* § 3:2 (2010). "[I]n the absence of an agreement to the contrary, trade fixtures attached to the purpose for which the building was constructed, will pass under the instrument that conveys title to the realty." *Tifton Corp. v. Decatur Fed. Sav. & Loan Ass'n*, 136 Ga.App. 710, 222 S.E.2d 115, 117 (1975) (holding that stoves and refrigerators in an apartment complex are part of the realty and pass with it) (citing *Wolff v. Sampson*, 123 Ga. 400, 51 S.E. 335 (1905)).

■ Alexander agrees that the refrigerators and ranges were part of the real estate unless an agreement to the contrary exists but argues that the Security Deed itself constitutes such an agreement. Section 1.1 of the Security Deed lists all the property securing the mortgage including, for example, the land, improvements on the land, easements, and, in section 1.1(e), fixtures and personal property. (Pl. Mot. Summ. J. Ex. B, Doc. 54–4 ("Security Deed") at § 1.1). Section 1.1(e) then identifies as collateral, *inter alia*, machinery, equipment, and fixtures, and provides examples of fixtures, including heating, air conditioning, plumbing, lighting communications, and elevator fixtures. (*Id.*) Alexander argues that by listing such mechanical fixtures as examples of "fixtures", the Security Deed appears to be defining "machinery", such as refrigerators and ranges, as something other than fixtures. And because "machinery" is listed under the heading "Fixtures and Personal Property" and machinery is not a fixture, Alexander argues, machinery is necessarily personal property.

Although Alexander's argument has superficial appeal, upon closer evaluation, the Court concludes that § 1.1(e) of the Security Deed does not constitute an agreement that the refrigerators and ranges would be excluded from the sale of the realty. The term "Personal Property," as defined by the Security Deed, actually includes a large amount of real property. According to § 1.3(a), "Personal Property" includes not only "chattels" and "equipment" but also "fixtures." And in this section, the parties "agreed that to the extent permitted by law, all of the [items defined as Personal Property are] to be deemed and held to be a part of and affixed to the Land and the Improvements." (Security Deed § 1.3(a).) In other words, items that are referred to as "Personal Property" in the Security Deed are also to be considered real property to

the extent Georgia law will allow. Thus, even though the refrigerators and ranges (and mechanical fixtures for that matter) are all referred to as "Personal Property" in the Security Deed, they are to be treated like real property. Accordingly, the Security Deed does not constitute an agreement that the refrigerators and ranges are excluded as real property. Therefore, the refrigerators and ranges were sold as real property at the foreclosure sale and their value cannot be considered as part of Alexander's wrongful foreclosure damages.

██ Alexander next argues that 232 dishwashers and microwaves were part of the personal property. Based on the same reasoning as above, it appears that these items were in fact intended to be sold as real property. Under the terms of the Security Deed, the dishwashers and microwaves were "deemed and held to be a part of and affixed to the Land and the Improvements" to "the extent permitted by law." (Security Deed § 1.3(a).) The law not only permits these items to be treated as realty, but presumes them to be so when they are "placed in a building subject to a mortgage, by a mortgagor or those claiming under him, to carry out the obvious purpose for which it was erected, or permanently to increase its value for occupation or use." *Tifton Corp.*, 222 S.E.2d at 117 (quoting *Cunningham & Co. v. Cureton*, 96 Ga. 489, 23 S.E. 420, 421 (1895)). This is true, even if the items "may be removed without injury to itself or the building." *Id.* Here, the microwaves and dishwashers were apparently placed in the apartment complex to carry out the obvious purpose of renting the apartments to tenants and to increase the apartments' value for occupation. Thus, these items appear to be part of the realty and were not sold along with the personal property at the foreclosure sale. In any

case, Alexander has put forth no evidence of the value of these items. Accordingly, even if they were part of the personal property, Alexander cannot recover damages associated with these items absent evidence of their fair market value at the time of the foreclosure sale.

██ Finally, Alexander suggests that a construction claim arising out of the architect's breach of its contractual duties and allegedly worth over $1 million, was part of the personal property. Alexander points to LSREF's response to its request to admit that the "personal property foreclosed on by Plaintiff at the Foreclosure Sale included the right to pursue construction defect claims arising out of the construction of the" Property. (Alexander Resp. at 21, Doc. 56.) LSREF's actual response does not clarify that the construction claim itself was part of the foreclosure estate. (Alexander Resp. Ex. F. (LSREF Resp. RFA) No. 1, Doc. 56-6.) Instead, LSREF explained that "Alexander's right to pursue construction defect claims arising out of the construction of the [Property] was automatically revoked after Alexander's default under the loan documents pursuant to the Assignment of Construction Documents, and such rights immediately became the property of LSREF." (*Id.*) It is only "[t]o the extent that Alexander's right to pursue construction defect claims ... was not revoked [that] LSREF admits that the foreclosure sale of personal property would have included" such rights. (*Id.*)

The Construction Assignment provided that all Alexander's "rights, title and interest in and to the Construction Documents" were assigned to its lender. (Arrowsmith Decl. Ex. D ("Construction Assignment") § 2.1, Doc. 54-6.) But as Alexander points out, the "Construction Documents" were by definition only those contracts between the borrower, Alexander, and the

architect or contractors. (*Id.*, §§ 1.1, 1.3, 1.4.) The record contains no evidence of a breach of contract claim involving a contract between Alexander and another entity. Rather, the only evidence regarding the construction claims at issue suggests that such claims arise out of a contract between the architect and an entirely separate entity known as Alexander Properties Group, Inc. ("APG"). (*See* Alexander Aff. ¶ 4, Doc. 56–1; Architect Contract, Doc. 56–1 at 11–20.) Pursuant to the plain, unambiguous terms of the Construction Assignment, the contract between APG and the architect was not assigned to the lender.

That the APG contract was not assigned to the lender, however, does not establish that the claim arising from that contract was necessarily part of the personal property. Based on Alexander's reasoning, the construction claim belongs to APG, not Alexander. And absent an assignment granting Alexander the right to pursue a breach of contract claim against the architect, APG is the entity who has such rights.[19] *See, e.g., Canton Plaza Inc. v. Regions Bank, Inc.*, 315 Ga.App. 303, 732 S.E.2d 449, 454 (2012) (holding that although a company might own another, it does not have the right to pursue the subcorporation's breach of contract claim). Alexander directs the Court to no evidence upon which a reasonable jury could conclude that the construction claim that appears to belong to APG was also part of the foreclosure estate, even though it may

very well have been. This construction claim can therefore not be part of Alexander's wrongful foreclosure damages.

Moreover, Alexander puts forth no evidence of the fair market value of the construction claim at the time of the foreclosure sale. Alexander instead points to LSREF's response to its requests to admit that in the Bankruptcy Court, LSREF's expert estimated the cost to repair construction defects to be $1.3 million. (Alexander Resp. at 19 and Ex. F, Doc. 56 and 56–6.) LSREF admitted that its expert appraised the cost to repair construction defects to be $1,143,281. (Alexander Resp. Ex. F. ("LSREF's Resp. RFA") No. 2, Doc. 56–6.) LSREF stated, however, that the "estimate of actual repair costs is distinguishable from its ability and right to pursue a claim for such defects as well as any potential recovery for such defects." (*Id.*) And Alexander offers no evidence of the value of the right to pursue the contract claim. The Court concludes, therefore, that whatever the value of the nebulous "construction claim," absent additional firm evidence, this value would not be considered as part of Alexander's damages should Alexander prevail on its wrongful foreclosure claim.[20]

In summary, should Alexander prevail on its wrongful foreclosure claim, it would be entitled to the difference in the fair market value of the furniture and the $25,000 sales price, as a credit towards its deficiency on the underlying loan.[21]

---

**19.** The record contains no evidence that any entity is actually pursuing the construction claim.

**20.** Alexander urges the Court to take judicial notice of an alleged admission before the Georgia Supreme Court that the value of the personal property was $507,000. (Mot. Judicial Notice, Doc. 65.) Alexander however misconstrues LSREF's filing. In its brief opposing Alexander's petition for certiorari,

LSREF summarized the testimony of the expert appraiser, who characterized certain property as personal property and valued that property at $507,000. But LSREF did not admit that this was an accurate value of the property actually sold as personal property.

**21.** The confirmation order does not indicate that the confirmation court necessarily decided what was or was not personal property

### d. Conclusion

Genuine issues of material fact exists regarding Alexander's wrongful foreclosure claim. In particular, a reasonable jury could conclude that LSREF's conduct at the foreclosure sale—including abruptly deciding to sell the personal property separately and offering a bid of $25,000 for property it believed was worth substantially more—rose to the level of a breach of its duty to exercise the power of sale fairly and resulted in a grossly inadequate sales price. Accordingly, the Court **DENIES** LSREF and Hudson's Motion for Summary Judgment as to this claim.

## V. Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** LSREF and Hudson's Motion for Summary Judgment [Doc. 54], **DISMISSES** Alexander's wrongful foreclosure claim against Hudson, and otherwise **DENIES** LSREF and Hudson's Motion [Doc. 54].[22]

The Court finds that the disputes between the parties rationally should be capable of settlement. Accordingly, counsel for the parties are **DIRECTED** to meet and confer regarding settlement of this matter within seven (7) days of the date of this Order. The parties are **DIRECTED** to file a joint statement within eight (8) days of the date of this Order notifying the Court regarding the status of their efforts to reach a settlement. If counsel are unable to reach an agreement for settlement at that time, the parties are **DIRECTED** to engage in mediation. The parties may mutually agree upon a private mediator or if unable to reach an agreement, the Court will appoint a private mediator from a list of three mediators to be provided to the parties. The parties should notify the Court within ten (10) days if they are unable to agree upon a mediator. The mediation in this matter must be completed within fifty (50) days of the entry of this Order. In the event the parties fail to reach an agreement, they **SHALL** submit their proposed Consolidated Pretrial Order within twenty (20) days of the conclusion of the mediation.

Prior to the filing of the proposed consolidated pretrial order, Alexander is **GRANTED** leave to take the deposition, at a mutually agreed-upon date and time, of Raymond Lowe, Senior Vice President of Wells Fargo Bank, N.A., for the purpose of attacking the Limited Power of Attorney purporting to grant Hudson the authority to assign Wells Fargo's interest in the loan documents.

---

when the court found that the real property was sold at or above fair market value.

**22.** As noted in note 1, above, the Court **DENIES** Alexander's Motion for Leave to File Surreply Brief [Doc. 63] and **DENIES AS MOOT** Alexander's Motion to Take Judicial Notice [Doc. 65].